[No. B042786. Second Dist., Div. Seven. Jan. 9, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD LEE MORSE, Defendant and Appellant.

**COUNSEL**

Phillip I. Bronson, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, William T. Harter, Jr., and Kristofer Jorstad, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOODS (Fred), J.**—A jury convicted appellant of two counts of first degree murder (Pen. Code,[1] §§ 187, 188, 189), one count of reckless or malicious possession of a destructive device (§ 12303.2), and found true both alleged special circumstances: multiple murder (§ 190.2, subd. (a)(3)) and murder by destructive device (§ 190.2, subd. (a)(4)). Appellant was sentenced to state prison for life without possibility of parole.

Appellant claims myriad errors. Principally: the trial court wrongfully excluded evidence of victim negligence relevant to proximate cause; and the trial court erroneously instructed the jury that if they found defendant had committed second degree murder, by law it becomes first degree murder.

We reject all appellant's claimed errors except one. We conclude the trial court erred in instructing the jury that they could use the crime of possession of a destructive device *twice*, first to find appellant had committed second degree murder, and second to convert that murder into murder of the first degree.

### FACTUAL BACKGROUND

*Summary*

Two Los Angeles police officers were dismantling a bomb in appellant's garage when it exploded and killed them.

The prosecution theory was that appellant had made, possessed, and intended to use the bomb and thereby proximately caused the death of the two officers. There was no evidence appellant intended the death of the police-victims.

The defense challenged the sufficiency of the prosecution's evidence. Appellant did not testify.

*Evidence appellant made, possessed, and intended to use the bomb*

We synopsize the evidence with a perspective favoring the judgment. (*People v. Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110].)

Appellant lived in North Hollywood at 6849 Vanscoy. In the late 1970's he became friends with one of his neighbors, Al Ward. They went on bicycle

---

[1]Unless otherwise noted all statutory references are to the Penal Code.

rides together and visited each other at their homes. Their wives were also good friends.

Sometime in October 1978 Mr. Ward went to appellant's house to go for a bike ride. Appellant showed Mr. Ward a used Xerox machine he had just bought and while they were in appellant's garage also showed him a book with descriptions of how to make a bomb. The book was gray with black binding, had sketches but was *not* "The Anarchist Cookbook" (a bomb-making book later recovered in appellant's house). Appellant told Mr. Ward, "I can make a bomb."

In 1985 William Enoch was married to appellant's sister, Ernestine, and was living in Orlando, Florida with her and their three children. In September 1985 Ernestine left Mr. Enoch, took the children, and came to California. They stayed with appellant at his Vanscoy home.

On Sunday, January 24, 1986, appellant telephoned Mr. Enoch, identified himself, spoke for a few minutes, and said he'd call back. About 20 minutes later, appellant again called Mr. Enoch. This conversation lasted about five minutes. Appellant told Mr. Enoch "to send him some money to take care of [his] children." At first, Mr. Enoch refused. At the end of the conversation appellant said: "Well, I don't appreciate people messing with my family. I have connections in Orlando and I can make your life miserable and I'll blow you up in your car."

Mr. Enoch immediately hung up, told a fellow worker about the threat, called the local police, and then at their suggestion, telephoned the North Hollywood, California police station and reported the threat.

About two weeks later, on February 8, 1986, at 7:30 a.m. a group of eight or nine Los Angeles police officers arrived at appellant's house to execute a search warrant on an unrelated matter. They entered, found appellant in a rear bedroom, and searched the house.

On the top shelf of the closet in appellant's bedroom an officer found a box wrapped with tape. Inside the box were shotgun shells bound with tape, and several .22-caliber and some .38-caliber rounds.

When attempting to search appellant's garage and his van, parked at the rear of the garage, the police noted that both were locked. They asked appellant for the keys. Appellant went to his closet and removed the keys from his pants and gave them to an officer.

Officer Asvonanda took the keys, unlocked the garage, entered, and began a search. After about five minutes he went to a small, freestanding wood

cabinet in the center of the garage. He opened its door, saw some cans on a shelf, moved them aside, reached behind them, felt a metal pipe, and pulled it out. He then saw that he was holding a three- to four-inch diameter pipe, nine inches long, capped at both ends, with wires and an attached battery. The wires led from the pipe back into the cabinet. Officer Asvonanda carefully put the pipe on a carpet in front of the cabinet, left the garage, and advised Detective Harley what he had found.

Detective Harley entered the garage, saw the wired pipe on the carpet and also saw that the wires were connected to a similar but longer pipe on a shelf in the cabinet. Detective Harley knew the pipes looked like bombs but didn't know if they were real. He asked his partner to bring appellant to the garage. Pointing to the wired pipe on the carpet, Detective Harley asked appellant what it was. Appellant said he had never seen it before. Detective Harley replied, "What do you mean? This is your garage. You gave me the keys." Appellant said, "I let a man and a woman store their property in the garage."

Appellant, under arrest, was transported to the station, the house was evacuated, and the Los Angeles police bomb squad was called.

About 10 a.m. the head of the bomb squad, Officer Arleigh McCree, arrived, followed 20 minutes later by his partner, Officer Ron Ball. Officer Ball photographed both pipe bombs. They then dismantled the smaller bomb.

Detective Leone entered the garage and showed Officers McCree and Ball the box of shells found in appellant's closet. The green Remington Peterson 12-gauge shotgun shells and Winchester Western .38-caliber rounds were the same as that just removed from the 9-inch pipe bomb. The shotgun shells removed from the pipe bomb, like those in the box, had been taped together.

Officer Ball took a small portion of the powder that had been removed from the one dismantled pipe bomb, went outside, put the powder in a large flower pot, and put a match to it. It burned rapidly.

Detective Douglass arrived at the scene about 10:45 a.m., after the one bomb had been dismantled. He went into the garage and was told by either Officer McCree or Ball that they were about to dismantle the second bomb. He left, with Officer Ball closing the garage door behind him. Ten or fifteen seconds later he heard an explosion, "a deafening noise," and "felt a blast pressure wave." He ran to the front of the garage and shouted to patrol officers to call for two ambulances. He then ran to the side garage door, forced it open with his shoulder, and entered. He checked Officer Ball for a pulse but felt none. Officer McCree's condition did not permit checking for

a pulse. Detective Douglass then got a garden hose and put out several fires in the garage.

Paramedics removed Officer Ball who soon died. The coroner removed Officer McCree.

Officers McCree and Ball each died from a massive number of shrapnel wounds. Deputy medical examiner Susan Selser, who performed both autopsies, had begun counting and identifying each shrapnel wound. When she got to wound number 115 on Officer McCree she stopped counting. Officer McCree suffered 25 shrapnel wounds to his right forearm, 8 to his left hand and lower forearm, his lower right leg and foot had almost been severed, there was near amputation of his right forearm, near complete amputation of his left hand, total amputation of his right hand, a gaping laceration severing most of the left side of his neck, a skull fracture, and multiple injuries to his face.

Officer Ball sustained shrapnel injuries to his head, face, neck, chest, and extremities. A skull fracture involved the top quarter of his head, his right leg was nearly severed, both hands had been amputated, his right eye had been punctured, and shrapnel had penetrated his brain.

About an hour after the explosion Detective Weller, second in command to the deceased, Officer McCree, arrived at the scene and took charge of the investigation. Noticing Officer Ball's camera among the garage rubble, he had the film flown to Parker Center, developed, and the prints returned to him. Based upon these photographs and the evidence recovered at the scene, Detective Weller made replica bombs.

Detective Weller described the bombs as follows: the master bomb was 12 inches long and the secondary, or slave bomb, 9 inches long. Inside of each were four 12-gauge Remington Peters number six-shot cartridges, taped together. Pyrodex, a low-grade explosive, filled the pipe cavity. A small light bulb filament was inserted in the pyrodex. A wire from the bulb fed through a drilled hole and connected to two 9-volt batteries taped to the outside of the master bomb. The pipes were capped at each end. A wood block affixed to the master bomb had the triggering mechanism, a folded piece of metal and a soldered wire. Wire connected the triggering mechanism to the batteries. A safety device consisting of a piece of rubber tubing covered part of the triggering mechanism. Black nylon fishing line was tied to the triggering device. Bungee cords were wrapped around each bomb.

The bungee cords were designed to attach the bombs to a car or some other object. When the car moved the nylon fishing line would become taut,

bend the piece of metal, cause contact with the soldered wire, switch the batteries on, emit current to the light bulb filament, heating it, and the heat would ignite the pyrodex causing detonation. The linked bombs would both explode. If one bomb failed, the other would still explode.

Detective Weller testified that the bombs had a single function: to kill people. Unlike time or command bombs these relied upon the movement of human victims to detonate them. Unlike some explosives, these bombs were designed to fragment and explode shrapnel.

The investigation showed the following: a roll of nylon fishing line found in appellant's garage matched that used on the bomb's triggering mechanism; inside appellant's van were two 9-volt batteries and a bungee cord, both similar to those used on the bombs; in appellant's kitchen, on a closed cabinet shelf, concealed in a sealed three-pound coffee can was a container of Pyrodex; the explosive material in the bombs was pyrodex; a bomb-making book, "The Anarchist Cookbook" was found in appellant's den; fibers removed from the exploded bomb tape matched the gold carpet in appellant's house; both the slave and master pipes had been threaded by a Tred-o-Matic machine whose four-jaw vise had left tool marks on both pipes; that Tred-o-Matic machine was about two blocks from appellant's house in a Snyder-Diamond hardware store; the metal plate portion of the bomb triggering device had tool marks which matched pliers found in appellant's garage; appellant's fingerprints, and only his, were found on the three-pound coffee can, the pyrodex container, the garage cabinet, and on cans in that cabinet; his fingerprints were found on the cover of "The Anarchist Cookbook" (as were his brother's) and on pages 113-114, beginning the chapter entitled "Explosives and Booby Traps."

DISCUSSION

1. *Exclusion of evidence: "Was that tool a factor in causing the explosion?"*

Appellant's trial counsel questioned Detective Weller about a pair of wire cutters found at the bomb scene. The wire cutters were "bent out of shape" and a part was broken off, damage apparently caused by the explosion. Appellant's trial counsel asked if this tool was "perhaps" one belonging to Officer McCree or Officer Ball and Detective Weller said "yes." Then appellant's trial counsel asked him the following question: "Was that tool a factor in causing the explosion?" An objection was sustained. Appellant contends the trial court committed prejudicial error in sustaining the objection and excluding Detective Weller's answer.

The predicate for the objected to question was a one-page budget memorandum submitted by the Support Services Bureau of the Los Angeles Police Department as part of its 1987/1988 budget. The memorandum requested an $11,106 authorization to purchase nine bomb squad tool kits at $1,234 each. As justification, the memorandum explained that bomb squad members now had their own miscellaneous equipment, not uniform bomb dismantling kits, and that "[e]ach [requested] item [in the kits] is coated to prevent accidental electronic contact. . . ." As further justification the memorandum stated: "On February 8, 1986, two Scientific Investigation Division, Bomb Technicians lost their lives while working on an improvised explosive device. [¶] *Investigation showed that a tool from their kits was a factor that caused their death.*" (Italics added.) The budget request memorandum was signed by the bureau commander, Captain Joseph C. Deladurantey but written by his subordinate, Lieutenant Finn. There was no written "investigation" report, the "investigation" was for budgetary request purposes only, and in preparing the memorandum Lieutenant Finn conferred only with Detectives Weller and Schube. Apparently the referred to "investigation" consisted of the unrecorded opinion by Detective Weller.

 Appellant's argument is this: if an "unforeseeable intervening cause" produced the officers' deaths appellant's "criminal liability" was "extinguish[ed]"; the wirecutters used by the officers were defective[2]; the officers were "negligent" in using such defective wirecutters; and by negligently using such defective wire cutters "the jury could have concluded that they were willing and foolhardy participants in reckless and negligent conduct . . . constitut[ing] an unforeseen, supervening, exonerating cause of their deaths."

We resist the temptation to consider this dubious argument because appellant is barred from making it. Evidence Code section 354[3] prohibits the reversal of a judgment based upon the erroneous exclusion of evidence unless "the substance, purpose, and relevance of the excluded evidence was made known to the [trial] court." (See *People* v. *Whitt* (1990) 51 Cal.3d 620, 646-650 [274 Cal.Rptr. 252, 798 P.2d 849].)

---

[2]There was no evidence the wire cutters were defective *before* the bomb exploded.

[3]The section provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [¶] (a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means; [¶] (b) The rulings of the court made compliance with subdivision (a) futile; or [¶] (c) The evidence was sought by questions asked during cross-examination or recross-examination."

On appeal, appellant contends the "substance, purpose, and relevance of the excluded evidence" was officer negligence or recklessness so extreme as to constitute a supervening, exonerating cause.

Not only did appellant *not* make known to the trial court that the "substance, purpose, and relevance" of the subject evidence was officer negligence or recklessness but appellant's trial counsel *expressly disavowed* any such officer negligence or recklessness.

Appellant's trial counsel stated: "So now that we are in trial and it's an appropriate time I will now say as affirmatively as I know how to say it, I know of no negligence on the part of the officers. I am offering no evidence that would purport to show that they were negligent. I propose to ask no questions to lead to an inference of negligence."

A short time later he stated: "Causation is an issue. Not negligence. There was not negligence. There was no negligence that I'm aware of. [¶] The consultants that I have talked with have said to me to my face, 'Don't expect to call me as a witness to prove there was any negligence.' I said, 'Okay, fine. If there wasn't any, that satisfies me.' "

The next day appellant's trial counsel reiterated his position: "I will state now for the third and the fourth time, I don't know, I have never known, and I waited this long in hopes that I might discover, what [the prosecutor] was referring to when he talked about alleged evidence of negligence. [¶] I saw none in any of the reports, I saw none in the preliminary hearing transcript. And when I sought out a bomb consultant, he said to me personally, as I said yesterday, don't call me thinking you're going to prove anybody was negligent, because they were not and I won't say so. And I said fine. I said I've never said there was."

Finally, in urging the trial court to permit Detective Weller to answer the subject question, appellant's trial counsel stated: "So the basis of my question is one that goes to cause, causation. *There is nothing in here that indicates any negligence.* [¶] *I have repeatedly stated I am not suggesting negligence.*" (Italics added.)

Given the explicit, repeated disavowals of officer negligence by appellant's trial counsel, the trial court's reaction to the subject question is unsurprising. The trial court stated:

"If we're not talking about negligence, we can talk about hundreds and maybe thousands upon thousands of ways to disarm a bomb.

"And we [ ] could talk all afternoon, perhaps, on how one is disarmed, defused, or what have you. But the question is: so what?

"If negligence is not a factor, these thousands of methods are of—are really not relevant. And the fact—and I think the question, the way it is framed, suggests that was a factor in causing that bomb to explode, in my judgment, is a question that is suggesting that the officer had it and was using it, and by reason of his use, that the bomb exploded and, ergo, there must have been some negligence on his part.

"That's my ruling as far as that."

We agree. Whether or not a tool used by a victim-officer was "a factor in causing the explosion" was *irrelevant* if the officer was reasonable and not negligent in using that tool. As a matter of law such use, under the instant circumstances, could not have been a supervening cause. Appellant cites no case, and we have found none, suggesting that *non*-negligent victim conduct may extinguish defendant criminal liability.

The cases relied upon by appellant are either adverse to his position or are inapposite.

In *People* v. *McGee* (1947) 31 Cal.2d 229 [187 P.2d 706] the defendant shot the victim in the stomach. Prompt medical care would have saved his life. Instead, the victim internally hemorrhaged for 10 hours before hospital officials ministered to him. He died the next day. The defendant offered evidence such delay was gross negligence but the trial court excluded the evidence. The Supreme Court held it was error to exclude the evidence but the error was harmless "because the testimony . . . would not, as a matter of law, have been sufficient to show a supervening cause of death which would relieve defendant from criminal responsibility . . . ." (*Id.* at p. 243.)

The erroneously excluded evidence in *People* v. *Taylor* (1980) 112 Cal.App.3d 348 [169 Cal.Rptr. 290] involved even more than gross negligence by the victim. The defendant furnished the victim heroin, the victim used the heroin, and died from its effects combined with alcohol. But the defendant offered evidence, excluded by the trial court, that the victim *intentionally* caused his own death, that he had been depressed, had talked of suicide, wanted to die, and in fact *had* committed suicide. ■ We agree with *Taylor* that evidence the victim *intentionally* caused his own death constitutes a causation defense and it is prejudicial error to exclude such evidence.

■ The instant facts are at the opposite end of the causation spectrum: Officers McCree and Ball did not intentionally cause their own deaths, they

were not grossly negligent, and they were not—as repeatedly represented by appellant's trial counsel—even contributorially negligent. *Taylor* is inapposite.

*People* v. *Armitage* (1987) 194 Cal.App.3d 405 [239 Cal.Rptr. 515] is adverse to appellant. "On a drunken escapade on the Sacramento River in the middle of a spring night, defendant . . . flipped his boat over and caused his companion to drown." (*Id.* at p. 409.) But defendant argued that it was not *his* negligent overturning of the boat which proximately caused the victim's death but "the victim's fatally reckless decision . . . to abandon the boat and try to swim to shore" which caused the victim's own death. (*Id.* at p. 420.) ▮ The Court of Appeal rejected defendant's argument, stating: "It has long been the rule in criminal prosecutions that the contributory negligence of the victim is not a defense. [Citations.] In order to exonerate a defendant the victim's conduct must not only be a cause of his injury, it must be a superseding cause. 'A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is "dependent" and not a superseding cause, and will not relieve defendant of liability.' [Citations.] Thus, it is only an unforeseeable intervening cause, *an extraordinary and abnormal occurrence*, which rises to the level of an exonerating, superseding cause." (*Id.* at pp. 420-421.) (Italics added.)

▮ We hold the trial court did not abuse its "wide discretion" (*People* v. *Taylor, supra,* 112 Cal.App.3d 348, 363) pursuant to Evidence Code section 352 in ruling that the subject evidence was not relevant.

2. *Exclusion of evidence: "It's a piece of cake."*

▮ After they had dismantled the slave bomb and before attempting to dismantle the master bomb, Officers McCree and Ball took a break. Officer McCree went to the front of appellant's house and, in response to questions about how his work was going, stated "It's a piece of cake." Appellant sought to introduce this statement but the trial court excluded it.

On appeal, just as with the excluded "tool factor" evidence, appellant contends the relevance of the excluded statement was officer negligence or recklessness so extreme as to constitute a supervening, exonerating cause.

Again, as with the "tool factor" evidence, no such purpose was communicated to the trial court. (Evid. Code, § 354.) In offering this evidence appellant's trial counsel did not deviate from his repeated disavowals of

officer negligence. The only ground he urged for the relevance of this evidence was "that [Officer McCree] knew that he was dealing with an explosive device," a fact not in dispute and clearly established by Officer McCree having dismantled the slave bomb.

The statement was not relevant and the trial court did not abuse its discretion in excluding it.

3. *Exclusion of Evidence: In the opinion of a defense bomb expert the bomb could have been safely moved and remotely rendered safe.*

Appellant's trial counsel sought to call a bomb expert witness, Mr. Newhouser, to testify that the bombs could have been safely moved and by remote means, rendered safe. The trial court excluded the offered evidence.

On appeal, as with the two other excluded items of evidence, appellant contends the expert opinion evidence was relevant to officer negligence. No such purpose was communicated to the trial court. (Evid. Code, § 354.) To the contrary, as we earlier noted, appellant's trial counsel explicitly stated that his bomb expert witness had told him "don't call me thinking you're going to prove anybody was negligent, because they were not and I won't say so."

With officer negligence specifically disavowed as a reason to admit the evidence, the trial court could find no other ground, explaining: "And the fact that Mr. Newhouser is—and I'm sure he is a very learned person in this area, I'm aware of his qualifications—but he is going to tell us another way of doing something. And the question is, if negligence is not relevant, simply put, so what? [¶] There may be hundreds of different ways. They could have left it alone, they could have it sit in the garage and walked away from it, that's one thing. They could have put it in a container, and the like. . . . [¶] The answer is it's not relevant."

The trial court did not abuse its discretion in excluding the evidence.

4. *Exclusion of evidence: impeachment of Mr. Enoch.*

Because Mr. Enoch had testified that appellant, only two weeks before the charged offenses, had threatened to blow him up in his car—appellant sought to impeach Mr. Enoch's credibility. Appellant was permitted to do so by eliciting the following: when Mr. Enoch went to the North Hollywood police station on April 7, 1986, and reported appellant's bomb threat, Mr. Enoch asked the police to help him enforce his Florida child custody order; the Los

Angeles Police Department gave Mr. Enoch money for food and lodging on several occasions; his wife Ernestine, appellant's sister, once had him arrested, claiming he had swung at her with a hammer; Mr. Enoch had recently written a four-page letter to the prosecutor in which he stated that his main concern was his children and their welfare.

The only impeachment of Mr. Enoch the trial court did not permit was the asking of the following question: "Isn't it true [you have] now taken the children . . . [to] North Carolina in violation of a court order?"

In explaining its ruling the trial court stated:

"But aren't we really talking about a really collateral issue here that requires foundation from various sources?

"We're in effect having something—actually dealing with some kind, as counsel said, marital dispute and custody and visitation over children. And it's far removed from 1985, December and January of '86. We're talking about issues that are—I don't see the credibility issue three years down the line.

"I expect we would probably, if we had to do it right, would have to bring in the people who have been involved in this marital dispute over custody and visitation, and have some kind of a mini trial, if you will, as to who was right and who was wrong.

"And I really don't think it touches on the credibility of this individual, nor do I think it has anything to do with bias or prejudice with respect to this defendant.

"This is obviously a dispute, from what I have heard, between the parents of children. One has a court order, if I'm not mistaken, in Florida, or a court order from some other state, perhaps California, and I don't know what's going on in North Carolina.

"But I think these are all collateral to the issue of credibility, incidents that have taken place perhaps three years after this phone call was made back in early 1986. I just don't think it merits consideration. Under 352, I would be in a position to say it's an undue waste of the court's time."

 Appellant contends that by excluding this impeachment evidence the trial court infringed his right to present a defense. "The claim does not withstand scrutiny. As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a

defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." (*People* v. *Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99].)

■ Our California Supreme Court recently reiterated trial court authority to enforce reasonable limits on cross-examination: "It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant . . . the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish." (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1091 [255 Cal.Rptr. 352, 767 P.2d 619].) (Original italics, internal quotation marks omitted, quoting *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 678-679 [89 L.Ed.2d 674, 682,-683, 106 S.Ct. 1431].)

■ For the reasons stated by the trial court, the subject question was impeachment on a collateral issue; was marginally probative, if probative at all; and would have consumed undue time. The trial court acted within its discretion in excluding the evidence. (Evid. Code, § 352.)[4]

5. *Instructions regarding "unforeseeable intervening cause."*

■ Appellant contends the trial court erred by failing to instruct, sua sponte, on "unforeseeable intervening cause." He principally relies upon *People* v. *Armitage, supra,* 194 Cal.App.3d 405.

*Armitage,* which we earlier discussed, does not involve sua sponte instructional duty. It merely elucidates the standard for superseding causes, requiring that they be "an unforeseeable intervening cause, an extraordinary and abnormal occurrence." (194 Cal.App.3d at p. 420.) In *Armitage* the defendant argued there was compelling evidence of such a superseding cause, the victim's reckless decision to abandon the overturned boat and his attempt to swim to shore.

Here, no evidence of victim-officer negligence or recklessness having been offered or received, there was no evidence of any intervening or superseding cause.

---

[4]The section provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

In addition to other causation instructions, the court advised the jury: "To constitute murder there must be, in addition to the death of a human being, an unlawful act which was a proximate cause of that death.

"A proximate cause of a death is a cause which, in natural and continuous sequence, produces the death, and without which the death would not have occurred.

"There may be more than one proximate cause of a death. When the conduct of two or more persons contributes concurrently as proximate causes of death, the conduct of each of said persons is a proximate cause of the death if that conduct was a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death." (CALJIC No. 8.55 (1987 rev.).)

This instruction correctly stated the law (*People* v. *Armitage, supra,* 194 Cal.App.3d 405, 420; *People* v. *Dominick* (1986) 182 Cal.App.3d 1174, 1209, fn. 26 [227 Cal.Rptr. 849]) and fully informed the jury of those "points of law pertinent to the issue" of causation (§ 1093, subd. (f)). Since there was no evidence of superseding cause it was not a proper subject of instruction.

■ Appellant further contends that in giving CALJIC No. 8.55 the trial court should have defined "natural and continuous." We disagree. Neither *People* v. *Hebert* (1964) 228 Cal.App.2d 514 [39 Cal.Rptr. 539], upon which appellant principally relies, nor any other cited authority so holds.

In *Hebert* a defendant who punched the victim causing him to fall and hit his head on a wood barroom floor was charged with the victim's death. But *after* that punch a succession of mishaps befell the victim: there was evidence the police dragged him from the bar, that at the sidewalk they dropped him on his face from a height of 12-14 inches, and at the station when the victim was standing with his hands above his head, he fell backward "like a board," striking his head on the cement floor. The victim died the next morning. As *Hebert* observed, "the question of proximate cause was an intricate and difficult one" (228 Cal.App.2d at p. 519) and an instruction which included such undefined and confusing terms as "efficient intervening cause" and "supervening cause" (*id.* at p. 520) was inadequate.

*Hebert* is inapposite. The instant facts did not involve any intervening causes, let alone "intricate and difficult" ones. Moreover, the confusing terms criticized by *Hebert* ("efficient intervening cause" and "supervening cause") were *not* part of the instruction given by the instant trial court. (See also *People* v. *Pike* (1988) 197 Cal.App.3d 732, 744 [243 Cal.Rptr. 54].)

We find no error.

6. *Inherently dangerous felony: section 12303 and section 12303.2.*

 As our California Supreme Court recently observed: "There is no precise statutory definition for the second degree felony-murder rule. In *People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620 [388 P.2d 892], we defined the doctrine as follows: 'A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes at least second degree murder. [Citations.]' In determining whether the felony is inherently dangerous, 'we look to the elements of the felony in the abstract, not the particular "facts" of the case.'" (*People* v. *Patterson* (1989) 49 Cal.3d 615, 620-621 [262 Cal.Rptr. 195, 778 P.2d 549].)

In applying this rule which "lies embedded in our law" (*People* v. *Phillips* (1966) 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353]) the following felonies have been held *not* inherently dangerous: grand theft (*People* v. *Phillips, supra,* 64 Cal.2d 574), possession of a firearm by a felon (*People* v. *Satchell* (1971) 6 Cal.3d 28 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]), possession of a sawed-off shotgun (*ibid.*), escape (*People* v. *Lopez* (1971) 6 Cal.3d 45 [98 Cal.Rptr. 44, 489 P.2d 1372]; *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913]), aggravated false imprisonment (*People* v. *Henderson* (1977) 19 Cal.3d 86 [137 Cal.Rptr. 1, 560 P.2d 1180]), and practicing medicine without a license (*People* v. *Burroughs* (1984) 35 Cal.3d 824 [201 Cal.Rptr. 319, 678 P.2d 894]).

On the other hand, these felonies have been held inherently dangerous: furnishing narcotics to a minor (*People* v. *Poindexter* (1958) 51 Cal.2d 142, 149 [330 P.2d 763]), furnishing phenobarbital (*People* v. *Cline* (1969) 270 Cal.App.2d 328, 331-332 [75 Cal.Rptr. 459, 32 A.L.R.3d 582]), driving under the influence of narcotics (*People* v. *Calzada* (1970) 13 Cal.App.3d 603, 606 [91 Cal.Rptr. 912]), burning of a motor vehicle (*People* v. *Nichols* (1970) 3 Cal.3d 150 [89 Cal.Rptr. 721, 474 P.2d 673]), furnishing methyl alcohol (*People* v. *Mattison* (1971) 4 Cal.3d 177 [93 Cal.Rptr. 185, 481 P.2d 193]), kidnapping (*People* v. *Romo* (1975) 47 Cal.App.3d 976 [121 Cal.Rptr. 684]; *People* v. *Kelso* (1976) 64 Cal.App.3d 538, 542 [134 Cal.Rptr. 364]), furnishing heroin (*People* v. *Taylor, supra,* 112 Cal.App.3d 348), felony child abuse by malnutrition and dehydration (*People* v. *Shockley* (1978) 79

Cal.App.3d 669 [145 Cal.Rptr. 200], and furnishing cocaine (*People* v. *Patterson*[5], *supra*, 49 Cal.3d 615).

■■■ Appellant contends that neither simple possession of a destructive device (§ 12303[6]) nor reckless or malicious possession of a destructive device (§ 12303.2) are inherently dangerous felonies. Since the jury may have relied upon these underlying felonies in determining the homicides to be murder, if appellant is correct the murder convictions must be reversed. (*People* v. *Green* (1980) 27 Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468].)

Whether or not possession of a destructive device (§ 12303) or the related but separate crime of reckless or malicious possession of a destructive device (§ 12303.2) are inherently dangerous felonies are apparently questions of first impression.

We need answer only one of these first impression questions. Since, by their verdict, the jury found appellant guilty of reckless or malicious possession of a destructive device (§ 12303.2), it is of no consequence that in instructing the jury on the second degree felony-murder rule the trial court referred only to *possession* of a destructive device[7] (§ 12303) (see *People* v. *Sedeno, supra,* 10 Cal.3d 703, 721; *People* v. *Turner* (1990) 50 Cal.3d 668 [268 Cal.Rptr. 706, 789 P.2d 887]).

We address only section 12303.2 which provides: "Every person who recklessly or maliciously has in his possession any destructive device or any explosive on a public street or highway, in or near any theater, hall, school, college, church, hotel, other public building, or private habitation, in, on, or near any aircraft, railway passenger train, car, cable road or cable car, vessel engaged in carrying passengers for hire, or other public place ordinarily

---

[5]*Patterson* did not determine that furnishing cocaine *was* inherently dangerous, only that the trial court could so determine. (*Id.* at p. 625.) Since the test is an *abstract one,* why the Supreme Court thought "[t]he task of evaluating the evidence on this issue is most appropriately entrusted to the trial court" (*ibid.*) is not self-evident.

[6]The section provides:

"Any person, firm, or corporation who, within this state, possesses any destructive device, other than fixed ammunition of a caliber greater than .60 caliber, except as provided by this chapter, is guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the county jail for a term not to exceed one year, or in state prison, or by a fine not to exceed ten thousand dollars ($10,000) or by both such fine and imprisonment."

[7]The court gave the following instruction: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a direct causal result of the commission of or attempt to commit a felony inherently dangerous to human life, namely, the crime of possession of a destructive device and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the second degree. [¶] The specific intent to commit possession of a destructive device and the commission of or attempt to commit such crime must be proved beyond a reasonable doubt." (CALJIC No. 8.32.)

passed by human beings is guilty of a felony, and shall be punishable by imprisonment in the state prison for a period of two, four, or six years."

The abstract elements of the offense are the reckless or malicious possession of an explosive device in any specified place. Common to each specified place is the proximity of people.

Appellant argues that because there are "*conceivable* [ ] ways of violating the statute that do not necessarily pose a threat to human life" the crime is not inherently dangerous. Further, appellant stresses that the instant bomb was hidden in a locked garage and secured with a safety device. This argument is mistaken.

We must view the *elements* of the offense, not the particular *facts* of the instant offense. In viewing the elements our task is not to determine if it is *possible* (i.e., "conceivable") to violate the statute without great danger. By such a test no statute would be inherently dangerous. Rather the question is: does a violation of the statute involve a *high probability* of death? (*People v. Patterson, supra*, 49 Cal.3d 615, 617.) If it does, the offense is inherently dangerous.

We do not regard the question as a close one. To recklessly or maliciously possess a bomb in a residential area, as appellant did, or in any place close to people, inherently involves a high probability of death. Almost uniquely, bombs have an "inherently dangerous nature." (*People v. Heideman* (1976) 58 Cal.App.3d 321, 335 [130 Cal.Rptr. 349].) They are so dangerous that even when *not* set to explode, their possession violates the statute. (*People v. Westoby* (1976) 63 Cal.App.3d 790, 795 [134 Cal.Rptr. 97].) As one court observed: "A bomb has special characteristics which obviously differentiate it from all other objects. In the first place, the maker often loses control over the time of its detonation. . . . In the second place, it may wreak enormous havoc on persons and property. In the third place, its victims are often unintended sufferers. And finally, considering its vast destructive potentialities, it is susceptible of fairly easy concealment." (*People v. Superior Court (Pebbles)* (1970) 6 Cal.App.3d 379, 382 [85 Cal.Rptr. 803].)

We hold that section 12303.2 is an inherently dangerous felony.

7. *Instruction regarding "set to explode."*

The trial court instructed the jury: "One need not possess a destructive device already set to explode in order to be guilty of recklessly or maliciously possessing a destructive device."

Appellant contends it was error to give the instruction because there was no evidentiary basis for it, it misapplied *People* v. *Westoby,* conflicted with the instruction defining "destructive device," and was an improper "pinpoint" instruction. We disagree.

There was an evidentiary basis for the instruction. Uncontradicted evidence established that when the master bomb was discovered its triggering device was protected by a piece of rubber tubing, a "safety device."

The instruction is a correct statement of the law (*People* v. *Westoby, supra,* 63 Cal.App.3d 790, 795; *People* v. *Heideman, supra,* 58 Cal.App.3d 321) and did not conflict with the instruction defining "destructive device."[8] Nor is it an improper "pinpoint" instruction.

There was no error.

8. *Misdemeanor-manslaughter instruction.*

■ Appellant contends the trial court should have instructed sua sponte on misdemeanor-manslaughter because simple possession of a destructive device (§ 12303) is a lesser included offense of reckless or malicious possession of a destructive device (§ 12303.2) *and* because simple possession of a destructive device *"could have been a misdemeanor."* (Italics added.)

Appellant is mistaken. Simple possession of a destructive device (§ 12303) is an alternative felony (a "wobbler"), punishable by imprisonment in either state prison or county jail. Since it is a crime "punishable . . . by imprisonment in the state prison" (§ 17) it was a felony *for all purposes* until validly reduced to a misdemeanor. (*People* v. *Banks* (1959) 53 Cal.2d 370, 380-383 [1 Cal.Rptr. 669, 348 P.2d 102]; *People* v. *Bozigian* (1969) 270 Cal.App.2d 373, 379 [75 Cal.Rptr. 876]; *People* v. *Samarjian* (1966) 240 Cal.App.2d 13, 23 [49 Cal.Rptr. 180].)

---

[8]The court instructed the jury as follows:

"A 'destructive device' includes any of the following weapons:

"1. Any bomb, grenade, explosive missile, or similar device or any launching device therefor.

"A 'bomb' is a device carrying an explosive charge fused to detonate under certain conditions.

"An explosive means any substance or combination of substances, the primary or common purpose of which is detonation or rapid combustion and which is capable of a relatively instantaneous or rapid release of gas and heat, or any substance the primary purpose of which, when combined with others, is to form a substance of a relatively instantaneous or rapid release of gas and heat. The term 'explosive' includes dynamite, nitroglycerin, black powder, pyrodex, and smokeless powder."

There was no basis for a *misdemeanor*-manslaughter instruction.

9. *Lesser included offense instruction.*

 Appellant contends the court erred in refusing to instruct on simple possession of a destructive device (§ 12303), a lesser included offense of recklessly or maliciously possessing such a device. (§ 12303.2.) Appellant is correct.

 " '[T]he trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." (*People* v. *Sedeno, supra,* 10 Cal.3d 703, 715.)

 The charged offense of section 12303.2 included the element of *reckless* or *malicious* possession, an element absent from section 12303. Since it was possible for the jury to entertain a reasonable doubt concerning this element, it was error for the court not to instruct on the lesser included offense, section 12303.

The remaining question is whether the error was prejudicial.

 "[I]n some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury." (*People* v. *Sedeno, supra,* 10 Cal.3d 703, 721.)

 As *People* v. *Westoby* concluded in similar circumstances: "In the instant case, it must reasonably be said that any evidence or inference 'that would support a finding that only the lesser offense was committed [had] been rejected by the jury.' " (*People* v. *Westoby, supra,* 63 Cal.App.3d 790, 796.) The jury's rejection was explicit in the instant case. By their verdict they found "true" the special circumstance allegation of bomb-murder which

required a determination that "[t]he defendant knew or reasonably should have known that his act or acts would create a great risk of death to a human being or human beings."

The instructional error was harmless.

10. *"Willfully" instruction.*

The court defined the word "willfully," instructing the jury: "The word 'willfully' when applied to the intent with which an act is done or omitted means with a purpose or willingness to commit the act or to make the omission in question. The word 'willfully' does not require any intent to violate the law, or to injure another, or to acquire any advantage." (CALJIC No. 1.20.)

Appellant contends this instruction negated other,[9] specific intent instructions and was error. Appellant's contention is not well taken.

The other instructions appellant refers to (see fn. 9.) do not contain the word "willfully." Since the subject instruction, CALJIC No. 1.20, directs the jury to employ its definition *when* the word "willfully" is *"applied to the intent* with which an act is done or omitted" they must have understood that when "willfully" was *not* so applied—i.e., the word was simply not used— the meaning of the word was not to be applied.

We are satisfied there was neither confusion nor error.

11. *Aiding and abetting instruction.*

The trial court instructed the jury on aiding and abetting (CALJIC Nos. 3.00 and 3.01). Appellant contends it was error to do so because there

---

[9] The other pertinent instructions are CALJIC Nos. 3.31 and 8.32. As modified by the trial court they read:

"In each of the crimes and allegations charged in Counts 1, 2 of the information, namely, murder there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator, to possess a bomb. Unless such specific intent exists the crime or allegation to which it relates is not committed. [¶] The specific intent required is to possess a bomb." (CALJIC No. 3.31.)

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a direct causal result of the commission of or attempt to commit a felony inherently dangerous to human life, namely, the crime of possession of a destructive device and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the second degree. [¶] The specific intent to commit possession of a destructive device and the commission of or attempt to commit such crime must be proved beyond a reasonable doubt." (CALJIC No. 8.32.)

was insufficient evidence of aiding and abetting and that the instruction was prejudicial because it was exploited by the prosecutor. Appellant relies upon *People* v. *Singleton* (1987) 196 Cal.App.3d 488 [241 Cal.Rptr. 842]. We find *Singleton* distinguishable and the contention without merit.

Slim but sufficient evidence justified aiding and abetting instructions. The fingerprint of appellant's brother was found on the cover of "The Anarchist's Cookbook"; appellant, when confronted by the slave bomb on his garage floor, denied all knowledge of it; appellant introduced evidence that he had had weekly garage sales during which numerous persons had unrestricted access to his garage.

*Singleton* is distinguishable. There, explaining the 42 cocaine bindles found in her boot, defendant claimed the driver of the car she had been stopped in, Bedell, had just given them to her. Bedell confirmed her account, claiming he had found the bindles, shortly before, in a parking lot.

In reversing the possession of cocaine *for sale* conviction (the transportation of cocaine conviction was affirmed), the appellate court found sufficient evidence to justify the trial court's aiding and abetting instructions but *no* evidence supporting the prosecutor's "phantom" aiding and abetting theory. Because it was clear the jury had relied upon and were confused by the prosecutor's theory, the error was prejudicial.

Here, although the prosecutor, out of an abundance, perhaps an over-abundance, of caution, did refer to the aiding and abetting doctrine; he did not rely upon it. Rather, as the evidence compelled, he emphasized "I will argue to you throughout this morning that this man is the only man responsible for this bomb." Moments later he stated, "So my final word I'm sure will be this man alone is responsible for the death of these officers."

If the slim evidence was *in*sufficient to justify the instructions, in light of the overwhelming evidence of appellant's possession of the bomb, the error was harmless. (*People* v. *Singleton, supra,* 196 Cal.App.3d 488, 493 ["Where accomplice instructions are clearly inapplicable to the case, the error is ordinarily not prejudicial, since it can be reasonably assumed that the jury ignored them."]; *People* v. *Hairgrove* (1971) 18 Cal.App.3d 606, 608-609 [96 Cal.Rptr. 142]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

12. *Limiting instruction regarding evidence of other crimes.*

 Appellant contends the trial court should have, sua sponte, given CALJIC No. 2.50, instructing the jury not to consider evidence of other

crimes as proof appellant is a person of bad character with a disposition to commit crimes.

The contention hinges upon Mr. Enoch's testimony that on January 24, 1986, about two weeks before the instant offenses, appellant telephoned him in Florida and threatened to blow him up in his car.

Appellant argues that this threat constitutes evidence of two "other crimes": section 422 (threatening another with death or great bodily injury), a felony, and section 653m (a telephone threat to inflict injury), a misdemeanor.

The contention does not withstand scrutiny.

*Assuming* that a California telephone call to Florida might violate both sections 422 and 653m, it is improbable that appellant's threat satisfied the "intent to terrorize"[10] element of section 422, that the jury would have been aware of such an esoteric statute, and if aware be prejudiced as a result.

The section 653m argument is similarly farfetched. If the jury believed the Enoch testimony they were "prejudiced" *not* because by making the threat appellant committed a *misdemeanor* (§ 653m) but rather because by evidencing *motive, knowledge,* and *intent,* the threat suggested appellant was responsible for the deaths of Officers McCree and Ball.

*People v. Collie* (1981) 30 Cal.3d 43, 63-64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776] holds that a trial court has no sua sponte duty to instruct on the limited admissibility of "other crimes" evidence. Only in a rare "extraordinary case" (*id.* at p. 64) might such a duty arise. This is not such a case.

13. *Evidence of implied malice.*

 "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187.) "Such malice may be . . . implied." (§ 188.) Implied malice is established when a person does " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People v. Phillips, supra,* 64 Cal.2d

---

[10]Former section 422.5 defined "terrorize," as used in section 422, as follows:

"As used in this title, 'terrorize' means to create a climate of fear and intimidation by means of threats or violent action causing sustained fear for personal safety in order to achieve social or political goals."

574, 587, quoted with approval in *People* v. *Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].) Implied malice requires "a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*Id.* at pp. 296-297.) (Original italics.)

 Appellant contends the evidence was insufficient to prove implied malice.

 "The proper test to determine a claim of insufficient evidence in a criminal case is whether, on the entire record, a rational trier of fact could find appellant guilty beyond a reasonable doubt. In making this determination, the appellate court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. . . . [O]ur task . . . is twofold. First, we must resolve the issue in the light of the *whole record* . . . . Second, we must judge whether the evidence of each of the essential elements . . . is *substantial* . . . .

"Although the appellate court must ensure the evidence is reasonable in nature, credible, and of solid value, it must be ever cognizant that it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends . . . . Thus, if the verdict is supported by substantial evidence, this court must accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of the fact-finder." (*People* v. *Barnes, supra,* 42 Cal.3d 284, 303-304. Internal citations and quotations deleted. Original italics.)

 Appellant couches his argument this way: "The record is devoid of any evidence that, at the time just prior to the appearance of the police, appellant actually appreciated that his possession of the bomb endangered the life of another. Rather, the facts [*sic*] that he was sleeping a few feet away from the bomb, and that his family was in the house indicates that he thought the bomb was safe, not a subjective awareness of its danger to human life."

We disagree with appellant's factual perspective and legal conclusion. Subjective appreciation of risk is not measured during sleep nor restricted to a "time just prior to the appearance of the police." In circumstances like the instant one involving ongoing possession of a bomb, implied malice may be determined by considering all relevant circumstantial evidence.

The following substantial evidence supports the jury's finding of implied malice: appellant made a linked slave-and-master bomb whose only purpose

was to kill people; he stored the bomb in his garage, part of a residential neighborhood; the bomb would explode if a soldered wire touched a nearby metal plate; only a piece of rubbertube protected the triggering contact; on January 24, 1986, appellant threatened to blow up Mr. Enoch; on February 8, 1986, appellant knew the police were going to search his garage and might find his bomb; on February 8, 1986, approximately 10 a.m. appellant knew the police had found and had moved the slave bomb; about an hour later, when an expert attempted to dismantle the master bomb, it exploded with a "deafening noise," dismembering and killing two people.

### 14. *Ireland error.*

Appellant claims *Ireland* (*People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]) error. He argues that because possession of the bomb was a "necessary ingredient of the homicide" it was "integral" to and "included in fact within the offense" and thus could not activate the felony-murder rule. Appellant is mistaken.

In *Ireland* an inebriated defendant who had shot and killed a victim was convicted of second degree murder by "bootstrapping" the underlying felonious assault into murder. In reversing the conviction the Supreme Court stated, "the utilization of the felony-murder rule in circumstances *such as those before us* extends the operation of that rule 'beyond any rational function that it is designed to serve.' [Citation.] To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides." (70 Cal.2d at p. 539.) (Italics added.)

*Ireland* has been applied when the homicide involved an *assault.* (*People* v. *Wilson* (1969) 1 Cal.3d 431 [82 Cal.Rptr. 494, 462 P.2d 22] [burglary-murder improper when burglary dependent upon entry with intent to commit felony assault]; *People* v. *Carlson* (1974) 37 Cal.App.3d 349 [112 Cal.Rptr. 321] [Defendant killed his pregnant wife and her fetus. Voluntary manslaughter of wife cannot make death of fetus second degree murder]; *People* v. *Smith* (1984) 35 Cal.3d 798 [201 Cal.Rptr. 311, 678 P.2d 886] [felony child abuse—murder].)

But *Ireland* has *not* been applied, even in assault-homicide cases, when death resulted "from conduct [with] an independent felonious purpose, such as robbery or rape, which happened to be accomplished by a deadly weapon and therefore technically includes assault with a deadly weapon." (*People* v. *Burton* (1971) 6 Cal.3d 375, 387 [99 Cal.Rptr. 1, 491 P.2d 793] [defendant

who shot and killed robbery victims was convicted of first degree murder. No *Ireland* error.].)

Further, *Ireland* has not been applied when there was no assault (*People* v. *Taylor* (1970) 11 Cal.App.3d 57 [89 Cal.Rptr. 697] [victim died from overdose of heroin furnished by defendant]) or when the "assault" had a "collateral" purpose (*People* v. *Mattison, supra,* 4 Cal.3d 177, 185 [victim died from methyl alcohol knowingly furnished by defendant]).

No assault was here involved. As the court stated in *Burton,* "The net effect of defendant's argument would be to eliminate the application of the felony-murder rule to all unlawful killings which were committed by means of a deadly weapon, since in each case the homicide would include *in fact* assault with a deadly weapon. . . ." (*People* v. *Burton, supra,* 6 Cal.3d 375, 386-387.) As did *Burton,* we reject the argument.

15. *Double use of felonious possession of a destructive device.*

▆▆▆▆ Appellant contends the trial court erred in instructing the jury that they could use the crime of possession of a destructive device *twice,* first to find he had committed second degree murder, and second to convert that murder into murder of the first degree. Appellant is correct.

The trial court instructed the jury that the accidental killing of a human being "which occurs as a direct causal result of . . . possession of a destructive device . . . is murder of the second degree." (CALJIC No. 8.32.) The trial court further instructed the jury: "Murder which is perpetrated by means of a destructive device or explosive is murder of the first degree. [¶] *Thus, if you find that the defendant has committed second degree murder by* either *second degree felony murder* or by implied Malice, *by law it becomes first degree murder.*" (Italics added.)

These instructions cannot be reconciled with California statutory and decisional law. Section 189 provides that "all *murder* which is perpetrated by means of a destructive device . . . , poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of . . . arson, rape, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 286, 288, 288a, or 289, is murder of the first degree; and all other kinds of murders are of the second degree." (Italics added.)

▆▆▆▆ This statute creates three categories of first degree murder: (1) willful, deliberate, and premeditated murder; (2) first degree felony murder

(a killing "committed in the perpetration of [specified felonies]"); and (3) *murder* perpetrated by a specified means such as "a destructive device."

Unlike the second category (first degree felony murder) which requires neither malice aforethought nor deliberation or premeditation, the third category (murder by a specified means) requires not just a killing but a *murder*. "It must be emphasized, however, that a *killing* by one of the means enumerated in the statute is not murder of the first degree unless it is first established that it is *murder*. If the killing was not murder, it cannot be first degree murder. . . ." (*People v. Mattison, supra,* 4 Cal.3d 177, 182, original italics.)

 The effect of the trial court's instructions was a rewriting of section 189. Instead of "All *murder* which is perpetrated by means of a destructive device" the section became "All *homicide* which is perpetrated by means of a destructive device." Put another way, the trial court's instructions *added* a felony to the first degree felony-murder rule: possession of a destructive device.

Although the reckless possession of a bomb (§ 12303.2) may become second degree murder, it does not, thereby, automatically become first degree murder. *People v. Mattison,* addressing a comparable provision of section 189, stated: "To go further, however and hold that . . . the use of poison is enough not only to supply the implied malice of murder but to make that murder of the first degree would make the use of poison serve double duty and result in criminal liability out of all proportion to the '*turpitude of the offender.*' [Citation.] It would extend the felony-murder doctrine 'beyond any rational function that it is designed to serve.' " (*People v. Mattison, supra,* 4 Cal.3d 177, 186.)

Respondent cites no case authorizing such "double duty" for felonious bomb possession, and we are aware of none. In fact, respondent's response to the issue is oblique, arguing only that "the evidence of *implied malice* was overwhelming."[11]

Having concluded that the first degree murder convictions must be reversed, we need not discuss other issues related to those convictions.

### DISPOSITION

For the reasons stated, the judgment is affirmed as to count three, conviction of section 12303.2, and reversed as to counts one and two, the convic-

---

[11]But not so "overwhelming" that the prosecutor chose to solely rely upon it to establish second degree murder. The second degree felony-murder rule was also relied upon. We cannot determine upon which theory the jury relied, thus the error was prejudicial. (*People v. Green, supra,* 27 Cal.3d 1, 69.)

tions of the first degree murders of Ronald Ball and Arleigh McCree. The cause is remanded to the superior court with directions to enter judgments of guilty of second degree murder, counts one and two, if the prosecutor consents to forgo prosecuting appellant for first degree murders, or to set the cause for retrial, if the prosecutor does not so consent. (See *People* v. *Webber* (1991) 228 Cal.App.3d 1146, 1172-1173 [279 Cal.Rptr. 437]; *People* v. *Riederer* (1990) 217 Cal.App.3d 829, 837 [266 Cal. Rptr 355]; see also *People* v. *Jaramillo* (1976) 16 Cal.3d 752, 760-761 [129 Cal.Rptr. 306, 548 P.2d 706].)

Lillie, P. J., concurred.

**JOHNSON, J.,** Concurring and Dissenting.—I concur with the majority that second degree felony murder based on reckless or malicious possession of a destructive device cannot be ratchetted up to first degree murder by application of Penal Code section 189.[1] (Maj. opn., *ante*, pp. 654-656.) Therefore, if defendant is guilty of murder, he is guilty of second degree murder. However, unlike the majority, I conclude the second degree murder convictions too should be reversed because the jury verdict may be based on what I deem an erroneous application of the felony-murder doctrine. Since the jury was instructed on both ordinary second degree murder and second degree felony murder, it is quite probable one or more jurors—and possibly the entire jury—found defendant guilty of felony murder but not of ordinary murder.

I find this an extraordinarily troubling case. Our research has been unable to uncover a single case anywhere in the country in which *possession* of a bomb or similar device has been held to justify a felony-murder prosecution. Likewise we have been unable to locate a single case in which a person has been convicted of felony murder because a bomb squad member was killed while attempting to disarm the defendant's bomb. Surprisingly, we have been unable to find such a case even where the defendant had activated and planted the bomb. So the majority opinion represents a drastic expansion of the felony-murder doctrine not only for California but for American jurisprudence in general.

To comprehend just what a broad expansion of felony-murder doctrine the majority opinion embraces, it is well to remember what this case is and what it is not. It is not a case where the defendant armed and planted a bomb in a place with the intent of killing someone. Nor is it even a case where he placed a bomb in an unoccupied structure hoping to inflict property damage. Nor was he charged with making the bomb. He was not even charged with the felony of possessing with intent to injure. He was only charged with

---

[1] All statutory references are to the Penal Code unless otherwise noted.

passive possession of the bomb, actually storing it in his own garage with the safety on. Had he been convicted of causing the bomb to come into existence, or of planting it in order to harm person or property, or even of possessing it with intent to injure this would have been an entirely different case.

This also is not a case where the bomb exploded while in defendant's possession. No one wandered into defendant's garage and accidentally ignited the bomb. Instead it exploded after law enforcement officers had taken full possession and control of the bomb in the name of the state and transported defendant to jail. So this is not even a case of *present* possession of a bomb. Instead the second degree felony-murder charge is predicated on defendant's *past* possession of the bomb.

It was while the state had full possession and control of this bomb that the bomb squad decided to disarm rather than remove and destroy the device. At that point, defendant had lost the ability and right to personally disarm or destroy or remove the bomb. Defendant was precluded from even introducing evidence the bomb squad's decisions and actions were grossly negligent and those decisions and actions rather than his own *past* possession of the device were the cause of the fatal explosion.

For the reasons explained below, the trial court committed prejudicial error in (1) instructing the jury it could convict defendant of second degree felony murder based on the reckless or malicious possession of a destructive or explosive device (§ 12303.2); (2) failing to recognize defendant's felony of reckless or malicious possession had terminated before the acts occurred which caused the deaths and thus the felony-murder doctrine did not apply even if this felony could otherwise serve as the predicate for felony murder; (3) excluding evidence from which the jury could have found the victim's acts rather than defendant's past possession of the bomb were the legal cause of the victims' death; (4) failing to instruct the jury on the lesser included offense of simple possession of a destructive device under section 12303. Each of these errors provides an independent ground for reversal.

I. *Possession of a Destructive Device or Explosive Is Not a Felony Which Can Serve as a Predicate for Application of the Felony-Murder Doctrine.*

First degree felony murder is a statutory crime defined by the Legislature. Second degree felony murder is not. Instead it is a creature of the California courts. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 472, fn. 19 [194 Cal.Rptr. 390, 668 P.2d 697]; but see *People* v. *Landry* (1989) 212 Cal.App.3d 1428,

1434 [261 Cal.Rptr. 254].) In any event, the Legislature has defined the felonies which will support first degree felony murder (§ 189) but for second degree felony murder that responsibility has fallen to the judiciary.

The California courts have set out a test for deciding whether a given felony belongs on this list. In order to support a conviction for second degree felony murder the predicate felony must be one "inherently dangerous to human life." (*People* v. *Patterson* (1989) 49 Cal.3d 615, 625 [262 Cal.Rptr. 195, 778 P.2d 549].) A felony is "inherently dangerous" only if there is " 'a high probability that it will result in death.' " (*Id.*, at p. 627.)

In holding possession of a bomb in violation of section 12303.2 is an inherently dangerous felony the majority reasons as follows: The abstract elements of the offense are the reckless or malicious possession of a bomb in proximity to people.[2] In viewing these elements it is "not [necessary] to determine if it is *possible* (i.e. 'conceivable') to violate the statute without great danger." The only question is whether "a violation of the statute involve[s] a *high probability* of death[.]" (Maj. opn., *ante*, p. 646, italics by maj.) The majority concludes, "[t]o recklessly or maliciously possess a bomb in a residential area, as appellant did, or in any place close to people, inherently involves a high probability of death." The majority bases its conclusion on the "inherently dangerous" nature of bombs. (*Ibid.*)

I disagree with the majority's conclusion for two reasons. The majority does not apply the test established by our Supreme Court for determining the inherent dangerousness of a felony. Furthermore, the majority expands criminal liability for the mere passive possession of a destructive device far beyond the moral culpability involved in such conduct.

The majority misstates the law when it says "our task is not to determine if it is *possible* (i.e. 'conceivable') to violate the statute without great danger." (Maj. opn, *ante*, p. 646, italics by maj.) On the contrary, our task is exactly the one the majority rejects. As stated in *People* v. *Burroughs* (1984) 35 Cal.3d 824, 830 [201 Cal.Rptr. 319, 678 P.2d 894], the task of the reviewing court is "to determine whether the felony taken in the abstract, is inherently dangerous to human life . . . or whether it possibly could be committed without creating such peril. . . . In this examination we are required to view the statutory definition of the offense as a whole, taking into account even nonhazardous ways of violating the provisions of the law which do not necessarily pose a threat to human life." (Accord *People* v.

[2]Section 12303.2 makes it a felony to possess a "destructive device" or explosive including, but not limited to, bombs. (See § 12301.) I interpret the majority opinion as limited to possession of bombs. (See *People* v. *Patterson, supra*, 49 Cal.3d at pp. 624-625.)

*Henderson* (1977) 19 Cal.3d 86, 94 [137 Cal.Rptr. 1, 560 P.2d 1180]; *People v. Satchell* (1971) 6 Cal.3d 28, 40 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]; *People* v. *Lopez* (1971) 6 Cal.3d 45, 51-52 [98 Cal.Rptr. 44, 489 P.2d 1372].)

The court, in *Patterson*, did say " 'an inherently dangerous felony' is an offense carrying 'a high probability' that death will result." (49 Cal.3d at p. 627.) But the test for whether a "high probability" of death is present remains an examination of the elements of the predicate felony in the abstract, including whether it could possibly be committed without creating such peril. (49 Cal.3d at p. 621, citing *People* v. *Henderson*, *People* v. *Burroughs, supra.*)

The primary element in section 12303.2 is the possession of a destructive device or explosive, in this case a bomb.

Neither I nor the majority has found any case in California or any other jurisdiction holding the mere *possession* of a bomb or other destructive device to be an inherently dangerous felony. Indeed, I have been unable to find a case in any jurisdiction holding the mere possession of any article to be a predicate felony for purposes of the felony-murder rule.

On the other hand, I have found a number of cases holding mere possession of an article having an inherently dangerous nature not be a felony inherently dangerous to human life. (*People* v. *Satchell, supra*, 6 Cal.3d at p. 42 [possession of sawed-off shotgun]; *People* v. *Williams* (1965) 63 Cal.2d 452, 458 [47 Cal.Rptr. 7, 406 P.2d 647] [possession of methedrine]; *State* v. *Brantley* (1984) 236 Kan. 379 [691 P. 2d 26, 29] [possession of knife by prisoner]; *State* v. *Underwood* (1980) 228 Kan. 294 [615 P. 2d 153, 161] [possession of firearm by ex-felon].) In *State* v. *Underwood, supra*, 615 P.2d at page 161, the court reasoned, "it seems unlikely that mere possession, which has been defined as dominion and control over an object, and not its use, could be undertaken in so dangerous a manner that the prohibited possession would result in murder in the first degree." Our Supreme Court, in *Satchell, supra*, stated: "Viewing the matter from the standpoint of inherent danger, we find it difficult to understand how any offense of mere passive possession can be considered to supply the element of malice in a murder prosecution." (6 Cal.3d at p. 42.) I share that difficulty. In my view, a bomb stored in a garage is no more threatening to human life than a sawed-off shotgun or controlled substance sitting on a shelf. Until that passive possession ripens into a felonious *act* by a human agent, dangerous to life, there is no basis for the imputation of malice. (See *Satchell, supra*, 6 Cal.3d at pp. 42-43.)

I am not persuaded the fact the article in question is a bomb is sufficient to distinguish this case from cases holding mere felonious possession of an article is *not* an inherently dangerous felony.[3] The majority relies on *People v. Superior Court (Peebles)* (1970) 6 Cal.App.3d 379, 382 [85 Cal.Rptr. 803], for the proposition "[a] bomb has special characteristics which obviously differentiate it from all other objects." Those characteristics are that a bomb may go off accidentally, it is capable of wreaking enormous havoc on persons and property, its victims are often innocent bystanders and it is easily concealed. (*Ibid.*) But, as news stories constantly remind us, guns share these same characteristics and their possession is not, per se, an inherently dangerous felony. (*Satchell, supra.*) Furthermore, none of these characteristics explain why mere possession of a bomb should be considered an inherently dangerous felony. There are no facts in the record suggesting a bomb sitting undisturbed on a shelf might self-detonate. (The bomb in *Peebles* was being carried in an attache case by one of the defendants when it exploded.) (6 Cal.App.3d at p. 381.)

The second element of the offense requires possession must be "reckless or malicious." Because this element is worded in the disjunctive, a person violates the statute if possession is *either* "reckless" *or* "malicious." (*People v. Heideman* (1976) 58 Cal.App.3d 321, 334 [130 Cal.Rptr. 349].) As noted above, in determining the inherent dangerousness of a felony the court looks to the least offensive conduct that would satisfy the statutory element. Thus, the question here is whether "reckless" or "malicious" possession of a bomb necessarily involves a "high probability of death." Or, to put it another way, is it possible to violate section 12303.2 without creating such peril? (*People v. Burroughs, supra,* 35 Cal.3d at p. 830.)

Clearly, it is possible to satisfy the reckless or malicious element of the statute without posing a threat to human life. (*People v. Westoby* (1976) 63 Cal.App.3d 790, 795 [134 Cal.Rptr. 97].) In *Westoby* the defendant was convicted of violating section 12303.2 "based upon evidence that when the [bomb] was found, it was 'believed that one of the battery wires was disconnected,' and that the timer had not been set; thus making it 'readily apparent that the device . . . was inoperative and inert,' since it 'could not have been exploded without reconnecting the loose battery wire and setting the timer.' " The Court of Appeal rejected defendant's argument the foregoing evidence was insufficient to satisfy the statutory requirement of reckless or malicious possession. The court reasoned: "One need not possess a destructive device already set to explode in order to violate Penal Code

---

[3] I will concede, for the sake of argument, there could be articles whose felonious possession would be inherently dangerous to human life; a barrel leaking a highly toxic substance, for example.

section 12303.2. The jury could reasonably have determined that Westoby's possession was either reckless *or* malicious." (63 Cal.App.3d at p. 795, italics in original.) Thus, in *Westoby*, defendant's possession of the bomb was held to satisfy the reckless or malicious element of section 12303.2 where his possession of the bomb posed no danger to human life because it " 'was inoperative and inert' [and] 'could not have been exploded without reconnecting the loose battery wire and setting the timer.' " (63 Cal.App.3d at p. 795.)

Similarly, in the case before us, defendant was convicted of violating section 12303.2 where the undisputed evidence showed the bomb was stored in his garage with its safety switch on.

The inescapable conclusion from *Westoby* and the facts of the case before us is that reckless or malicious possession of a destructive device, as that term is used in section 12303.2, does not necessarily require possession of a device which is in a condition to pose an immediate threat to human life. Thus, viewed in the abstract the felony of "reckless or malicious" possession can be committed without posing a "high probability of death."

Of course, if possession is of an extremely reckless nature, manifesting a conscious disregard for human life a jury might find implied malice under basic murder principles. But under prevailing California law the jury cannot do so through application of the felony-murder rule. The "recklessness" or "maliciousness" of the possession does not convert the crime of possession into a proper predicate felony for a felony-murder charge. Instead, the law allows that "recklessness" or "maliciousness" to be used to establish the element of malice in a prosecution for ordinary murder. (*People* v. *Satchell, supra,* 6 Cal.3d at p. 42.)

The final element, that possession is in proximity to people, adds nothing to the statute in terms of inherent dangerousness to human life. Due to the broad wording of the statute (see maj. opn., *ante,* at pp. 645-646), it would be virtually impossible to possess a bomb and not satisfy the proximity element. Furthermore, the proximity of at least one person, the victim, is an implicit element in every felony on which felony murder is predicated.

If this were a case in which defendant had taken a step beyond mere possession, and was engaged in committing some *act* involving a high probability of death at the time the officers suffered their fatal injuries, I would have no trouble affirming the second degree felony-murder conviction as the law of felony murder now stands. Or, if it had been proved defendant

possessed the bomb with the *intent* to commit an act having a high probability of death at the time these officers suffered their fatal injuries, I would concur in the majority's judgment.[4]

But here we have a case which boils down to the mere passive possession by the defendant of a destructive device, a bomb, the maximum sentence for which is six years in prison. In my view, allowing such a crime to serve as a predicate for a murder conviction "erodes the relation between criminal liability and moral culpability." (*People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130].) Up until now, the trend in California, led by our Supreme Court, has been to limit, not expand, the felonies which can serve as predicates for a second degree felony-murder conviction. (See *People* v. *Patterson, supra,* 49 Cal.3d at pp. 622, 627; *People* v. *Burroughs, supra,* 35 Cal.3d at pp. 829, 832-833.) The few felonies the court has found to be inherently dangerous share characteristics which are totally absent from a felony whose principal element is passive possession of a dangerous article. First, as the court noted in *Burroughs, supra,* 35 Cal.3d at page 832, the felonies that the court has found support a murder conviction have been "tinged with malevolence." (E.g., poisoning food, drink or medicine with intent to injure, *People* v. *Mattison* (1971) 4 Cal.3d 177 [93 Cal.Rptr. 185, 481 P.2d]; wilful and malicious burning of an automobile, *People* v. *Nichols* (1970) 3 Cal.3d 150 [189 Cal.Rptr. 271, 474 P.2d 673].) Second, the court has endeavored to maintain a parity between felonies legislatively recognized as supporting first degree felony murder and felonies judicially recognized as supporting second degree felony murder. (*People* v. *Patterson, supra,* 49 Cal.3d at p. 626, fn. 8.) Third, every such felony has involved an affirmative *act* on the part of the defendant, which act posed an immediate and inherent threat to human life. (E.g., *furnishing* narcotics, *People* v. *Poindexter* (1958) 51 Cal.2d 142 [330 P.2d 763]; *poisoning* food, drink or medicine, *People* v. *Mattison, supra*; *burning* an automobile, *People* v. *Nichols, supra.*) Indeed, the only time the court was faced with a felony-murder charge in which the predicate felony involved mere possession of a dangerous instrument the court resoundingly rejected the charge stating, "mere possession *in itself*—ignoring the propensities and conduct of the possessor—is essentially neutral in its intentional aspect and should not serve as the basis for the imputation of malice." (*People* v. *Satchell, supra,* 6 Cal.3d at p. 43, italics in original.)

The majority's opinion in this case is the first ever in the country, so far as I can determine, holding the mere felonious possession of an article is

---

[4]It is worth noting defendant was *not* charged with felony murder based on section 12303.3 which makes it a felony to possess a destructive device "with intent to injure, intimidate, or terrify any person, or with intent to wrongfully injure or destroy any property."

sufficient to pose "a high probability" of death. For the reasons set forth above, I respectfully dissent from that holding.[5]

II. *The Deaths of the Police Officers Were Not "Committed in the Perpetration of" a Felony Because Defendant's Felonious Possession of the Bomb Had Terminated and the State Had Acquired Possession Before the Officers Exploded the Bomb; Defendant's Possession of the Bomb and the Explosion Which Killed the Officers Were Not Part of One Continuous Transaction.*

Felony murder requires the killing to have been "committed in the perpetration of or attempt to perpetrate" the felony. (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) §§ 470, 472, pp. 528-582, explaining this language in § 189.) While our Supreme Court has rejected "any technical inquiry concerning whether there has been a completion, abandonment, or desistence of the felony before the homicide was completed" (*People* v. *Chavez* (1951) 37 Cal.2d 656, 669-670 [234 P.2d 632]), it also has recognized felonies do terminate at some point. In robbery, by far the most common predicate felony in felony-murder prosecutions, the felony ends for purposes of the felony-murder rule when the defendant escapes to a "place of temporary safety." (*People* v. *Salas* (1972) 7 Cal.3d 812, 822 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832]; *People* v. *Milan* (1983) 9 Cal.3d 185, 195 [107 Cal.Rptr. 68, 507 P.2d 956].) A killing which occurs after that time—a shootout at the robber's second hideout or a homicide in a squabble over the proceeds—is not considered to be committed in the course of the robbery and thus is not felony murder even though the robbery may be a "but for" cause of the death. Presumably, the robbery also is terminated for purposes of the felony-murder rule when the defendant's attempt has been thwarted, and he has been arrested and incarcerated in jail. The death of an officer run over and killed by a motorist while leaving the scene after the robber had been taken to jail would not be charged to the robber as a felony murder arising out of his unsuccessful crime.

In this case defendant's possession of the bomb—and thus his felony—was over and done with long before the acts which killed the officers occurred. Law enforcement officers had taken full possession and control of

---

[5]Because the People relied on both traditional second degree murder and second degree felony murder the error in instructing the jury on second degree felony murder requires reversal. (*People* v. *Green* (1980) 27 Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Satchell, supra*, 6 Cal.3d at pp. 31, 43.)

On remand the People would be free to retry the defendant on the charge of second degree murder based on traditional murder principles. (*People* v. *Satchell, supra*, 6 Cal.3d at p. 42, [see maj. opn., *ante*, pp. 652-653].)

the bomb in the name of the state. Defendant himself had been arrested, placed in custody and transported to the police station. It was while the bomb was in the possession of the state—not the defendant—that this fatal explosion occurred. The bomb squad did not consider this bomb something still in defendant's possession they were attempting to disarm for defendant's benefit. If he had called from the jail and asked them to stop working on the bomb and return it to him they would have laughed in his face. Nor would they even have returned the dismantled bomb to him had they succeeded in their efforts to neutralize it. No, the state had taken complete dominion and control of this dangerous apparatus and defendant's possession and thus his felony had terminated long before the bomb squad started taking it apart. Thus, this is far different from a situation where an accidental fire ignited the bomb and killed a neighbor or where an inquisitive child snuck into the garage and accidentally blew himself up as he played with the bomb *while the bomb was still in defendant's possession.*

Assuming mere passive possession of a dangerous article is to be considered a predicate felony for purposes of the second degree felony-murder rule that crime likewise must have a termination point. For this specie of crime it requires no "technical inquiry" to identify the critical point because the "transaction" involved is not comprised of a series of complex, often simultaneous actions by several persons. (As might be expected in the typical fast-moving robbery or similar active felony, most claims the felony terminated before the killing occurred have involved surrenders or arrests, often momentary, instants before the victim's death. (See, e.g., *People* v. *Mitchell* (1964) 61 Cal.2d 353, 362 [38 Cal.Rptr. 726, 392 P.2d 526] [defendant who committed robbery guilty of first degree felony murder despite evidence he attempted to surrender just before shooting broke out] and see cases collected in Annot., What Constitutes Termination of Felony for Purpose of Felony-Murder Rule (1974) 58 A.L.R.3d 851, 902-906.)

In a passive possession the "transaction" is simply defendant's possession of the dangerous article. It begins when he takes possession of the article and ends when he gives up or is deprived of possession of the article. Here defendant's possession of the bomb was terminated, albeit involuntarily, when the officers took possession of it, arrested defendant and took him to jail. He was in the same position as the unsuccessful robber who is in custody when the officer is run over by a motorist while leaving the robbery scene.

The fact defendant's possession was over and his felony terminated before the acts which produced the deaths occurred has the same consequences for defendant's liability under the felony-murder rule as it would for a robber who had reached a "place of temporary safety" before the acts which

produced death occurred. The felony-murder rule simply does not apply to the postfelony deaths even though one can say that "but for" defendant's felony—the robbery in one case, the possession of the bomb here—those subsequent deaths would not have occurred. Of course, as in the completed or terminated robbery situation, the defendant here may well be prosecuted for murder because of the deaths of these bomb squad members under another theory. He simply cannot be prosecuted under a felony-murder theory where the predicate felony was over before the acts producing the deaths occurred.

Nor is this a case where the "killing and felony are parts of one continuous transaction." (*People* v. *Chavez, supra,* 37 Cal.2d at p. 670.) Defendant was not charged with any crime which involved introducing the bomb into the stream of human activity and thus setting something in motion which had to be stopped. He was not charged with manufacturing or transporting the bomb. He was not even charged with possessing the bomb with *intent* to injure a person or destroy property. (See discussion *ante,* fn. 4.) This bomb was not ticking. It was stored in the back of a cabinet in defendant's garage with its safety switch on.

Defendant's transaction of felonious possession of the bomb came to an end when he was arrested and taken into custody. At that point possession of the bomb passed to the police department. It was not until some time later, when the police attempted to disarm the bomb, that it exploded, killing the officers. Thus under the facts of this case it cannot be said defendant's possession of the bomb and the deaths of the police officers were parts of one continuous transaction. The state had taken complete possession and control of the bomb. Since its safety was on, the bomb squad could have waited hours or days to deal with this device. They could have transported it to an entirely different place. They could have used any of a variety of methods to neutralize or destroy the bomb they now possessed. That the acts producing the deaths occurred on defendant's premises and even on the same day as defendant's possession of the bomb terminated was entirely determined by decisions made by the *present* possessors of the bomb, the state's agents. If there ever was *discontinuity* between a defendant's past felonious transaction and the deaths ascribed to that transaction, it is in this case.

Furthermore, if the "transaction" of mere passive possession, albeit reckless or malicious—which is all this defendant is charged with—is deemed to continue beyond defendant's actual possession, the result is to expand the felony-murder rule beyond any logical relationship between criminal liability and moral culpability. To illustrate, assume a third person stole or otherwise acquired possession of this bomb and stored it in his garage. The

police discover it, arrest the third person, take possession of the bomb, call the bomb squad, and a bomb squad member is killed while attempting to dismantle it. Are both the defendant in this case and the third person guilty of felony murder for that death? They both are guilty of *past* felonious possession of the bomb, albeit at different times, but neither possessed it at the time the acts producing the death occurred. And what if the bomb passed through 10 people's hands before the police discovered it and attempted to dismantle it? Are all 10 guilty of felony murder? They certainly are all *past* felonious possessors of this same bomb.

Or is only the "*immediate* past possessor" to be held responsible? If so, on what basis in morals or logic do we distinguish the person from whom the police took the bomb which killed them and someone earlier in the chain of custody? The first possessor and the last, and those in between, are all equally guilty of the same crime as to the same destructive device and each contributed as much—and as little—as any other to the deaths that ultimately occurred. It is one thing to trace liability for felony murder through several hands to the person who manufactures a bomb. It is quite another to fix that kind of permanent criminal liability on someone who only possessed the bomb for a period of time before it passed into another's possession and, while in that other person's possession, exploded and killed that person. Yet this is precisely what the majority opinion does in this case.

The foregoing examples illustrate why our Supreme Court has taken the view "the felony murder doctrine be given the narrowest possible application" (*People* v. *Satchell, supra,* 6 Cal.3d at p. 34) and why mere passive possession cannot be deemed to continue beyond defendant's actual possession of the object. To apply the felony-murder rule to instances of *past* possession is inconsistent with its ostensible purpose: "to deter those *engaged* in felonies from killing negligently or accidentally." (*Ibid.,* italics added.) Applying these principles to the present case, I would hold defendant cannot be convicted of murder under a second degree felony-murder theory.

III. *It Was Prejudicial Error to Exclude Evidence Relevant to the Victims' Gross Negligence or Recklessness on the Issue of Causation.*

Defendant contends the trial court denied him the opportunity to establish the police officers' conduct in dismantling the bomb was a superseding cause of their deaths because the court excluded evidence of the officers' gross negligence and recklessness. The majority opinion evades this issue claiming defense counsel failed to apprise the trial court of the substance, purpose and relevance of the excluded evidence. (Evid. Code § 354.) The record does not support the majority's claim.

Admissibility of evidence of the police officers' conduct on the issues of negligence and causation was argued to the trial judge at great length before and during trial. Essentially the People argued the defense was attempting to introduce irrelevant evidence of victim negligence while the defense argued it was attempting to introduce evidence of the victims' conduct to negate the element of causation. The debate over the admissibility of conduct evidence involved a written motion by the People to exclude the subject evidence with points and authorities by both parties, two pretrial hearings, further argument at the beginning of the trial and argument on the People's objections to the proffered evidence. It would serve no purpose to quote these portions of the record at length. Suffice it to say that on the basis of the pretrial arguments, the questions themselves and the colloquies with the trial judge, the court was fully informed the defendant's purpose in offering the evidence was to negate the element of causation by showing gross negligence or reckless behavior on the part of the police officers. This is not a case like *People* v. *Whitt* (1990) 51 Cal.3d 620, 648 [274 Cal.Rptr. 252, 798 P.2d 849], cited by the majority, where "the phraseology is so inherently broad and the range of conceivable answers so vast, that we cannot know whether [the] response might have influenced [the verdict]."

The excluded evidence is discussed in detail in the majority opinion, *ante*, at pages 635 through 640 and need not be repeated here. In summary, the trial court refused to allow defendant to introduce evidence that a police investigation of the explosion which killed the officers concluded, "a tool from [the deceased officers'] kits was a factor that caused their death." The court also refused to admit the testimony of a neighbor who heard Officer McCree remark, before attempting to dismantle the bomb, the bomb was "a piece of cake." In addition, the court refused to allow the testimony of defendant's explosives expert who would have testified the safer alternative under the facts of this case was to remove the bomb to a place where it could be harmlessly destroyed by remote control.

The trial court excluded the foregoing evidence on the ground the victim's intervening negligence is not a defense to homicide. The court's exclusion of the evidence would have been correct if the purpose of the evidence was merely to show the officers were negligent in dismantling the bomb. (See, *People* v. *Armitage*, (1987) 194 Cal.App.3d 405, 420 [239 Cal.Rptr. 515]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 397, p. 454.) Here, however, the purpose was not to show the officers were negligent in dismantling the bomb but to show their negligence broke the chain of causation thus relieving defendant of liability for their deaths. Evidence of causation is always relevant in a homicide case because " '[c]ausal relation is the universal factor common to all legal liability . . . in a breach of contract as in

murder.' " (*People* v. *Harrison* (1959) 176 Cal.App.2d 330, 333-334 [1 Cal.Rptr. 414], citation omitted.) Felony murder is no exception. "As long as the homicide is the direct causal result of the [felony] the felony-murder rule applies whether or not the death was a natural or probable consequence of the [felony]." (*People* v. *Stamp* (1969) 2 Cal.App.3d 203, 210 [82 Cal.Rptr. 598]; and see *People* v. *Caldwell* (1984) 36 Cal.3d 210, 219 [203 Cal.Rptr. 433, 681 P.2d 274].)[6]

The test for causation was stated in *People* v. *Harris* (1975) 52 Cal.App.3d 419, 427 [125 Cal.Rptr. 40] as follows: "If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability." Thus, although it is true the victim's intervening negligence is generally not a defense to homicide, the victim's negligence *does* affect causation "if it may be said that the defendant's criminal act was only a remote cause, and that the sole proximate cause was the negligent or reckless conduct of the victim . . . ." (1 Witkin & Epstein, *supra*, § 397, p. 454; and see *People* v. *Pociask* (1939) 14 Cal.2d 679, 687 [96 P.2d 788] and *People* v. *Lett* (1947) 77 Cal.App.2d 917, 921 [177 P.2d 47].) Numerous cases from California and other jurisdictions, as well as respected commentators, have recognized the possibility of the victim's intervening negligence affecting causation to such an extent the defendant is relieved of liability. (See, e.g., *People* v. *Pociask, supra*, 14 Cal. 2d at p. 687; *People* v. *Armitage, supra*, 194 Cal.App.3d at pp. 420-421; *People* v. *Lett, supra*, 77 Cal.App.2d at p. 921; *Carbo* v. *State* (1908) 4 Ga.App. 583 [62 S.E. 140, 141]; Focht, *Proximate Cause in the Law of Homicide—With Special Reference to California Cases* (1938) 12 So.Cal.L.Rev. 19, 34; Leavens, *A Causation Approach to Criminal Omissions* (1988) 76 Cal.L.Rev. 547, 571.) However, in order for the victim's conduct to be a superseding cause it must have been "highly extraordinary" under the circumstances. (*People* v. *Armitage, supra*, 194 Cal.App.3d at pp. 420-421; see also *People* v. *Hebert* (1964) 228 Cal.App.2d 514, 521 [39 Cal.Rptr. 539] [cause is superseding if "an extraordinary and abnormal occurrence."])

Given the obvious difficulty of establishing the victim's conduct was a superseding cause it is not surprising this defense has remained largely a

---

[6]The trial court correctly ruled defendant's mere possession of the bomb did not eliminate the requirement the prosecution establish possession of the bomb was the proximate cause of the officers' death. In civil actions for damages resulting from ultrahazardous activities, California does not follow the Restatement rule the defendant is strictly liable although the harm results from unexpected reckless conduct. (Rest.2d Torts, § 522.) Rather, in California, "an essential element of a plaintiff's cause of action, whether based on negligence or strict liability, is the existence of a causal connection between defendant's act and the injury which plaintiff suffered." (*Smith* v. *Lockheed Propulsion Co.* (1967) 247 Cal.App.2d 774, 780 [56 Cal.Rptr. 128, 29 A.L.R.3d 538]; and see *Luthringer* v. *Moore* (1948) 31 Cal.2d 489, 495, 501 [190 P.2d 1]; BAJI No. 6.60.)

theoretical one. I have found only one case in which a defendant's homicide conviction was reversed on the ground of the victim's own conduct. In *Carbo* v. *State, supra,* 62 S.E. 140, the defendant's criminal negligence created the risk of explosion in a building. The victim was fully warned of the danger and was urgently requested to stay out. He went in anyway and was killed in the subsequent explosion. The defendant's conviction for involuntary manslaughter was reversed.

The facts in *Carbo* suggest gross negligence or recklessness on the part of the victim may constitute the type of "highly extraordinary" conduct or "abnormal occurrence" which will constitute a superseding cause of death. Although no California case deals with gross negligence or recklessness of the victim, the case of *People* v. *McGee* (1947) 31 Cal.2d 229 [187 P.2d 706] discusses the intervening conduct of a third party and suggests the kind of showing of gross negligence or recklessness which may, under certain circumstances, constitute a superseding cause.

In *McGee* defendant shot the victim in the abdomen. The victim died the next day as a result of hemorrhage from the bullet wound. On appeal, the defendant argued the trial court erred in excluding evidence tending to show the proximate cause of death was not the bullet wound but the manner in which the wound was treated. The court stated, " 'The proper, and probably generally accepted, view [is] that mere negligence [in treating a wound] is no defense even though it is the sole cause of death because it is a foreseeable intervening cause. But death caused by grossly improper treatment is not the proximate consequence of the defendant's injury unless the injury is an actual contributing factor at the time of death, because such treatment is an unforeseeable intervening cause.' " (*Id.* at p. 240, quoting from Focht, *Proximate Cause in the Law of Homicide, supra,* 12 So.Cal.L.Rev. 19, 34, citations omitted.) As Professor Leavens put it, "Simple negligence, although hopefully unusual, is sufficiently ordinary that we more properly classify it as part of the normal background . . . . We usually come to the opposite conclusion for intentional or grossly negligent malpractice." (Leavens, *A Causation Approach to Criminal Omissions, supra,* 76 Cal.L.Rev. at p. 571.)

The People contend the trial court did not err in excluding evidence of the officers' conduct in dismantling the bomb because negligence on the part of police officers responding to harm or a threat of harm initiated by the defendant was reasonably foreseeable. The People rely on cases involving police pursuit of fleeing felons.

In *People* v. *Pike* (1988) 197 Cal.App.3d 732 [243 Cal.Rptr. 54], two police cars pursuing Pike in a high-speed chase collided, resulting in the

death of one of the officers. Although the evidence reflected the deceased officer's negligence contributed to the collision, the court held the officer's conduct was not a superseding cause. It was reasonably foreseeable that in a high-speed chase initiated by the defendant one or both of the officers might lose control of his vehicle or collide with another vehicle. "The probability that this might result . . . is sufficient to establish that defendant's conduct was a cause that, in the natural and continuous sequence, produced Officer Esquibel's death. . . ." (*Id.*, at p. 750.)

*People* v. *Harris, supra,* also dealt with a collision involving a police vehicle engaged in a high-speed chase with defendant. In *Harris* the police vehicle collided with a private automobile, killing one of the passengers. The trial court set aside the information charging defendant with vehicular manslaughter on the ground defendant's conduct was not the proximate cause of the decedent's death. The Court of Appeal reversed, stating:

"The evidence adduced at the preliminary hearing indicates that defendant initiated an unlawful and reckless course of speed on public streets and then continued it for 4.4 miles in an effort to evade law enforcement officers who, using emergency sirens and red lights, tried to apprehend him. Toward the end of the high speed chase a third law enforcement unit was involved in apprehending defendant. His speed at times exceeded 100 miles per hour. It was reasonably foreseeable that the officers would continue to chase him as he speeded recklessly and circuitously over public thoroughfares and failed to stop at boulevard stops, thus setting in motion circumstances creating peril to others on the public streets and a high probability that collisions, injuries and deaths would occur in the course of the chase." (52 Cal.App.3d at p. 427.) Although it found sufficient evidence to justify a prosecution, the court in *Harris* specifically noted the question whether the police officer's conduct during the chase was so "disconnected and unforeseeable as to be a superseding cause . . . is a question of fact to be determined by the trier of fact beyond a reasonable doubt." (*Id.*, at p. 428, fn. 4.)

While ordinary negligence on the part of one responding to the harm or threat of harm caused by the defendant may constitute part of the "natural and continuous sequence," gross negligence or recklessness by the victim may constitute a superseding cause. The jurors in the present case were entitled to have the benefit of the defense theory and evidence before them so that they could make an informed judgment on the issue of proximate cause.

Exclusion of defendant's evidence on the issue of causation was prejudicial error.

The state bears the burden of proving beyond a reasonable doubt every element of the offense charged. (*In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].) Here, the jury was correctly instructed, "To constitute murder there must be, in addition to the death of a human being, an unlawful act which was the proximate cause of that death." Thus, although the jury was instructed it must find defendant's act was the proximate cause of the officers' death, the only evidence on causation it was allowed to consider was the prosecution's. A defendant cannot, constitutionally, be denied the right to present probative evidence rebutting an element of the crime. (*People* v. *Wetmore* (1978) 22 Cal.3d 318, 321 [149 Cal.Rptr. 265, 583 P.2d 1308].) By ruling the defendant's evidence as to causation inadmissible, the trial court effectively took the determination of proximate cause away from the jury. (Cf. *People* v. *Marsh* (1962) 58 Cal.2d 732, 741 [26 Cal.Rptr. 300, 376 P.2d 300].) It is no answer to say the state's evidence, standing alone, was sufficient to establish the element of causation beyond a reasonable doubt where the evidence which might have created a reasonable doubt was excluded.

Because the trial court's error denied defendant a right fundamental to a fair trial—the right to present a defense—the murder convictions must be reversed unless we can say the error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Marsh, supra*, 58 Cal.2d at p. 741.) For the reasons discussed below, in this case it cannot be said exclusion of the defendant's evidence was harmless beyond a reasonable doubt.

This case is distinguishable from cases involving high speed police pursuits of fleeing criminals. Nothing in the facts suggests the situation in defendant's garage was infused with excitement or tension. On the contrary, Officer McCree's remark dismantling the bomb would be "a piece of cake" suggests a very relaxed atmosphere prevailed. Unlike officers confronted with a person driving in a wild and dangerous manner on the public highways, the officers here were not faced with an exigent circumstance. The evidence shows the bomb could be safely handled even by a nonexpert, as Officer Asvonanda demonstrated when he removed it from the cabinet and set it on the garage floor. The bomb had no timing device and its safety mechanism was in place.

Using a defective tool to defuse a bomb suggests gross negligence if the officers knew or should have known the tool was defective. Whether the tool was defective before the bomb blast and the state of the officers' knowledge about the tool is unknown because the trial court refused to allow defendant to inquire on this subject. Officer McCree's statement the bomb was "a piece

of cake" may have been intended to relieve the anxiety of the neighbors or it may have indicated Officer McCree was approaching the task of dismantling the bomb with scant care. The fact the bomb had no timing device and its safety mechanism was on suggests dismantling it in defendant's garage, as opposed to transporting it for safe destruction by remote control may have been an "extreme departure from the ordinary standard of conduct." But, again, defendant was not allowed to examine the police officer who investigated the explosion or his own expert witness concerning the deceased officers' standard of conduct.

It is well established under our constitution "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." (*Chambers* v. *Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297, 312, 93 S.Ct. 1038].) The testimony rejected by the trial court went to an essential element of the crime of homicide. That testimony was critical to defendant's defense. In these circumstances, where a constitutional right directly affecting the ascertainment of guilt is implicated, the conclusion is inescapable defendant was denied a trial in accord with fundamental standards of due process. In reaching this conclusion I am by no means suggesting the evidence defendant sought to introduce would have established, as a matter of law, the officers' conduct was a superseding cause of their deaths thereby relieving defendant of criminal liability. Nor is it my view a jury would or should reach such a conclusion from the evidence—only that it could. But the fact that it could reach such a conclusion had it heard the defendant's evidence entitles the defendant to a new trial on the murder charges.

IV. *Failure to Instruct on the Lesser Included Offense of Simple Possession of a Destructive Device Was Prejudicial Error.*

The majority correctly holds it was error not to instruct the jury on simple possession of a destructive device under section 12303. (Maj. opn., *ante*, pp. 648-649.) Yet the majority also finds this error was harmless because the factual question posed by the omitted instruction, whether possession was without recklessness or malice, was necessarily resolved against defendant by the jury's finding true the special circumstance of murder by bomb. A finding of this special circumstance required the jury to find "[t]he defendant knew or reasonably should have known his act . . . would create a great risk of death to a human being. . . ." (Cf. *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].)

I find the majority's reasoning circuitous. As previously noted, the predicate felony in this case was the reckless or malicious possession of a

destructive device. (§ 12303.2.) If the jury based its finding of second degree murder on the prosecution's second degree felony murder theory it necessarily found, as it was instructed, defendant committed "a felony inherently dangerous to human life." Having found the defendant committed a felony inherently dangerous to human life, to be consistent the jury would have to find defendant had the requisite mental state for the special circumstances: "The defendant knew or reasonably should have known that his act . . . would create a great risk of death to a human being. . . ."

In other words, the special circumstance finding was an inevitable consequence of the initial conviction of reckless or malicious possession of a destructive device. The special circumstance finding is not an *independent* finding of reckless or malicious possession. We cannot know what the jurors would have done if properly instructed about the lesser included offense of simple possession merely because they said "ditto" when asked a second time about one of the essential elements of the greater offense. Therefore the *Sedeno* harmless error analysis does not apply in this case.

Furthermore, *People* v. *Westoby, supra,* relied on by the majority, is not applicable to the case before us. In *Westoby* the jury was instructed on reckless or malicious possession under section 12303.2 and simple possession of an explosive under Health and Safety Code section 12305 but the jury was not instructed on simple possession of a destructive device under section 12303 (the same error as in our case). The court in *Westoby* reasoned the error in not instructing on simple possession under section 12303 was harmless because the jury specifically found defendant not guilty of simple possession under Health and Safety Code section 12305 (63 Cal.App.3d at pp. 794, 796). The court found harmless error under *Sedeno* because the jury, given the opportunity to find defendant guilty of possession but without recklessness or maliciousness did not do so. Instead the jury found defendant guilty of a felony requiring possession with recklessness or maliciousness. (*Id.,* at p. 796.)

In the case before us, unlike *Westoby,* the jury was not given an opportunity to find defendant guilty of a crime involving possession but without recklessness or maliciousness. Therefore the error was prejudicial.

This error not only requires reversal of defendant's conviction of malicious and reckless possession of a destructive device, it also infects the felony-murder conviction. Neither the trial judge nor the majority opinion considered whether the simple possession felony was "inherently dangerous to human life" and could support a felony-murder prosecution. For reasons discussed above, I am convinced a *malicious or reckless* possession, especially one which is past, cannot serve as the predicate for a felony-murder

conviction. Those arguments apply with even greater force where the underlying felony is simple possession. Thus, when the trial court denied the jury the opportunity to return a verdict of simple possession, it likewise deprived the defendant of the opportunity for a jury verdict on that count which probably would have precluded an instruction on felony murder. Moreover, this instructional error remains prejudicial as to the felony-murder count no matter how one rules on the question of using malicious and reckless possession to support a felony-murder count.

## CONCLUSION

It is an understatement to call this an important case in the area of felony murder. The majority opinion has stretched the bounds of that concept in several directions. The only question is whether the opinion has gone too far in one or all those directions. I feel it has. My esteemed colleagues obviously feel otherwise.

Contrary to prior California law, the majority opinion holds *possession* of a dangerous object, without any act or intent to use the object, can supply the predicate for a felony-murder conviction. The opinion then lays a felony-murder curse on the possessor which does not go away even after the felony has terminated, the possessor no longer has possession, and the state has assumed complete dominion over the device. It next denies the former possessor an opportunity to prove the deaths resulted from an independent superceding cause attributible to those who had taken possession from him. And finally, the opinion finds harmless the failure to give a lesser-included instruction which was supported by the evidence and which, if given, might have nullified the felony-murder theory employed in this case, even assuming that questionable theory has merit.

For any and all these reasons, I would reverse this conviction. Nonetheless, while I am convinced this conviction requires reversal because of the misapplication of second degree felony-murder doctrine, I in no way mean to imply this defendant cannot be prosecuted for murder for the deaths of these two bomb squad experts. But the required malice must be proved. Neither the felony alleged here—nor the simple possession which was erroneously withheld from the jury—can be substituted for that vital mental element of the crime of murder.

The petitions of both respondent and appellant for review by the Supreme Court were denied April 16, 1992.