Filed 2/19/14  P. v. Barkley CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C072822 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F880) |
| v. | |
| JERMAINE JUSTIN BARKLEY, | |
| Defendant and Appellant. | |

A jury found defendant Jermaine Justin Barkley guilty of forcible rape, forcible oral copulation, assault with a firearm, battery with serious bodily injury, false imprisonment by violence, felon in possession of a firearm, illegal possession of ammunition, criminal threats, possession of cocaine, and possession of methamphetamine, while sustaining enhancements for great bodily injury and use of or armed with a firearm.  The trial court sustained a strike, a serious felony, and two prior prison term allegations and sentenced defendant to 80 years to life plus a consecutive 59 years.

On appeal, defendant contends limitations on the cross-examination of the complaining witness deprived him of his right to confrontation, and trial counsel was ineffective for failing to request a pinpoint instruction on voluntary intoxication. The People ask us to correct three sentencing errors. We shall modify the sentence and affirm the judgment as modified.

FACTUAL AND PROCEDURAL BACKGROUND

On February 7, 2012, Tara S.[1] texted defendant in response to his Facebook request to her regarding a video shoot for his music. Defendant picked up Tara and her friend Jenny that evening. They went to Safeway and bought alcohol before going to defendant's apartment.

Jenny, who had been arguing with her boyfriend on the phone, left the apartment to talk to him. Tara talked about music with defendant while waiting for her friend. Defendant showed her drugs and a gun he had inside the apartment. At around 3:18 a.m., Tara texted Jenny, "you lookin' saucier than tartar. What are you doing leaving me with niggs? You know I ain't down." According to Tara, this was an attempt to determine why her friend had left her in the apartment.

When defendant put his hand on her leg, Tara told him she needed to leave. Defendant became angry and struck her under her left eye with his gun. Tara thought defendant was angry because he had been drinking. She went to the bathroom crying and with a bleeding eye.

Defendant went to the bathroom and told Tara, to shut up so the neighbors would not hear. He grabbed her by the hair and beat her with the gun. Defendant then called her a snitch and said she was trying to get him in trouble and back in jail.

---

[1] Tara S. testified under immunity that she was involved in the sale of marijuana and prescription pills. Before the rape and assault, she had tried to sell three pounds of marijuana.

2

Defendant took Tara out of the bathroom and onto the bed. Defendant hit her in the head and face with his gun. He also ripped out her hair extensions, leaving bald spots that remained through the trial.

Tara stopped screaming after defendant threatened to kill her if she did not stop. Defendant then took off her sweatpants and had intercourse with her. He also inserted his fingers into her vagina. After about 10 minutes, defendant turned Tara over, held her face into a pillow, and continued to rape her while hitting her on the back of her head with the gun. After this, defendant grabbed Tara's hair, put her face next to his penis, held a gun to her head, and forced her to perform oral sex on him for about 45 minutes as he struck her. He then applied lubricant to her stomach, got on top of her, and raped her again.

Defendant forced Tara to walk into the living room at gunpoint. He put pornography on the television and made her get on her knees and perform oral sex on him while he sat on the couch. Defendant hit her across the face with the gun about every 10 seconds.

Tara lost consciousness at some point. After the oral sex ended, defendant made her lie down on the floor as he watched pornography. Eventually, defendant made Tara get up and go back into the bedroom, where he continued to rape her and force her to perform oral sex on him while he struck her with the gun.

Defendant stopped late that night or very early in the morning, when it was still dark outside. He wrapped Tara in a blanket and set her on a couch in the bedroom. Defendant threatened to kill her the next day. Tara agreed with defendant that it was her fault in order to calm him down. After watching him fall asleep, Tara waited a long time before trying to escape. She wiggled out of the blanket and ran to the front door as quickly as possible. Wearing only a shirt, undershirt and bra, she escaped out the front door and went into a neighbor's apartment. The neighbor called 911 and said Tara had been badly beaten and raped.

Redding Police officers arrived to find Tara "hysterical." According to police, "her face was completely beaten up. Her left eye was swollen shut and bleeding out of it." Tara's right eye was also beaten, and she had bruises on her arms, legs, hands, and neck. As a result of the attack, she suffered sciatic nerve damage in her back, a cracked left eye with constant pain and nerve damage, and memory loss.

Tara told officers she was raped, beaten with a gun, and held throughout the night. She identified a vehicle in the parking lot as belonging to the man who attacked her.

Tara was taken to the emergency room for treatment. According to the treating doctor, she was under "enormous emotional distress," and told him that she was hit multiple times in the head with a gun and a fist. The emergency room nurse had to leave the room after first seeing Tara; Tara's face was so swollen, it was difficult for the nurse to remain composed. Tara told the nurse that her assailant hit her with a gun, penetrated her with his penis and finger, and forced her to orally copulate him.

Defendant gave an incorrect address to officers when he was arrested. There were abrasions on his knees and cheek. He complained of wrist pain, so an officer took him to a doctor for an examination. Defendant told the emergency room doctor he hurt his wrist that day by punching someone in the face.

Officers searching defendant's apartment encountered two pit bulls and noticed a strong odor of bleach. Tara's hair extensions, purse, and a shoulder holster were found in a closet. Tara's pants, a pair of defendant's jeans, and a loaded semiautomatic Ruger handgun were found in a clothes hamper in the bedroom. The bedroom also contained Tara's hair, bracelets, and a bottle of bleach. A bottle of Formula 409 was found on the back of the toilet with a dried bloodstain on the handle of the bottle. Blood was also found on the wall, a window, and bloody rags were found in the garbage can.

Samples from defendant's gun and penis tested positive for blood. Human blood was also found in samples taken from the mattress, a bracelet, the bathroom floor, and the carpet. Based on DNA testing, Tara could not be excluded as a major contributor to the

4

DNA sample from defendant's penis or the blood found on his gun. The criminalist found there was strong evidence defendant was the source of the sperm in the swab taken from Tara's vagina.

Tara testified that she did not consent to having sex with defendant. She explained she did not know defendant and was "not attracted to [B]lack men." Tara testified to knowing a person named Isaac. She had sent him a text which said, "I'm still coming, nig, LOL." Tara did not think he was a Black man. She explained that she calls lots of her friends "nig" and it "does not have anything to do with the color of their skin. It's just something I say to my friends." The term "nig" in the text to Jenny on the night of the attack referred to defendant.

Defendant testified he was a convicted felon and a recording artist. Tara contacted him regarding his Facebook posting about a music shoot, and he picked her up on February 7. When they got to the apartment, defendant showed her his stash of money, jewelry, and drugs, as well as some music projects he was working on. Tara told defendant that she grew marijuana to make money. She asked to spend the night, so defendant got her a blanket so she could sleep on the couch. As defendant dozed off, Tara attempted to perform oral sex on him. Defendant was confused but did not try to stop her. Tara asked if they could have sex. Defendant agreed, and they went to the bedroom. Tara went to the bathroom and defendant started to fall asleep after they finished.

Defendant awoke to a weight on his chest and something stinging his face. Tara was on top of him, pointing a gun at his face, and demanding money and drugs. Defendant knocked away the gun, sat up, and pushed her off, causing Tara to partially fall off the bed. In the ensuing struggle, defendant grabbed her hair and told her to give up the gun. He hit her in the face about 15 times before she released the gun.

Tara complied with defendant's request to get on the bed. She could not explain her conduct. He allowed Tara to go to the bathroom to clean up because she was

bleeding. After she finished, defendant had her stay on the couch and gave her a blanket. Tara, who asked defendant not to hurt or kill her, eventually fell asleep. Defendant fell asleep after Tara. He awoke to someone pounding on his front door; no one responded when defendant asked who was there. Tara was no longer in the apartment but some of her clothing and personal effects remained.

The defense sought to impeach Tara with evidence she dated Black men. Counsel wanted to establish she had relations with Isaac, who the defense thought was Black. The defense was not able to locate him.

The trial court initially ruled the defense could not ask Tara whether she had prior consensual sex with others. Defense counsel later renewed his contention that he should be allowed to ask Tara if she had relations with Isaac. The trial court said the defense would first have to present evidence of Isaac's race. Defense counsel noted Tara's use of the term "nig" in the text to Isaac and said this was a slang term for "nigger." Defense counsel argued that he wanted to ask Tara if Isaac was a Black man, and if she said no, to explain her use of the term "nig" in the text to him. The trial court ruled that the defense could ask Tara about this at an Evidence Code section 402 hearing.

At the hearing, Tara testified that she thought Isaac was "like Puerto Rican or something, something like that. I'm not a hundred percent sure . . . ." She probably referred to him as a "nig" in a text, explaining, "I don't really mean anything by it. I would call -- I call quite a few people that." Further explaining, she said, "I call everyone that, I guess. I don't really mean -- I mean, it's like slang, I guess." She did not know what the term was slang for, as "it's just something I say."

The trial court ruled that the defense could ask Tara about the use of the term "nig" in the texts to Isaac and Jenny. It could not ask Tara about any prior sexual conduct because she testified that she did not perceive Isaac to be Black.

6

# DISCUSSION

## I

### *Limits On Cross-Examination*

Defendant contends the trial court violated his right to confrontation by preventing the defense from asking Tara if she had prior consensual sexual relations with Isaac.  We disagree.

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."  (Evid. Code, § 353, subd. (a).)

While defendant sought to question Tara about her possible sexual relations with Isaac, the defense never asserted that it was entitled to open this line of questioning pursuant to the right to confrontation under the state and federal Constitutions.  When the trial court ruled the defense had not established the necessary foundation to question Tara about her prior relations with Isaac, defendant did not raise an objection based on his right to confrontation.  Failing to articulate a confrontation clause claim below precludes defendant from tendering it on this appeal.  (*People v. Burgener* (2003) 29 Cal.4th 833, 869.)  Defendant's contention would fail even if it were not forfeited.

The Sixth Amendment's confrontation clause guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him.  (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 685-686 [89 L.Ed.2d 674, 682-683].)  The essential purpose of this right is " 'to secure for the opponent the opportunity of cross-examination.' [Citation.]"  (*Davis v. Alaska* (1974) 415 U.S. 308, 315-316 [39 L.Ed.2d 347, 353], italics omitted.)  However, neither the confrontation clause nor state law affords the right to unlimited cross-examination.  (*People v. Sully* (1991) 53 Cal.3d 1195, 1219-1220.)  Trial courts retain wide latitude to impose reasonable limits on cross-examination without

7

violating the confrontation clause to prevent prejudice and confusion of the issues or to curtail interrogation that is repetitive or marginally relevant. (*People v. Morse* (1992) 2 Cal.App.4th 620, 642.) The ordinary rules of evidence do not compromise a defendant's right to a fair trial or to present his defense. (*Id.* at pp. 641-642.)

A defendant cannot present evidence of the complaining witness's prior sexual conduct to prove consent. (Evid. Code, § 1103, subd. (c)(1).) One exception to this rule is that such evidence is admissible to attack the credibility of the complaining witness. (*Id.*, § 1103, subd. (c)(5).) Such evidence is only admissible after an in camera hearing and is subject to the limitations of Evidence Code section 352. (*People v. Chandler* (1997) 56 Cal.App.4th 703, 707-708.)

The defense was afforded ample opportunity to cross-examine Tara. This included her use of the very questionable term "nig" in two texts. Inquiry into Tara's possible prior sexual relationship with Isaac was relevant only if the defense established that he was Black and therefore attacking the credibility of Tara's testimony that she was not attracted to defendant because he was Black. The defense had no direct evidence that Isaac was Black, it could not produce him as a witness, and Tara testified that she did not perceive him as being Black. The only evidence that Isaac was Black, was Tara's use of "nig" in the text to him, and that was countered by Tara's explanation that she used that term as slang rather than with a racial connotation.

It was neither an abuse of discretion nor a violation of the right to confrontation for the trial court to find defendant had not sufficiently established Isaac's race and therefore disallow this single line of inquiry. In addition, in light of the overwhelming evidence of defendant's guilt and the considerable evidence bolstering Tara's credibility, any possible error in failing to allow the questioning was also harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)

8

## II

### *Ineffective Assistance Of Counsel*

Defendant contends trial counsel was ineffective for failing to request a pinpoint instruction on voluntary intoxication as a defense to criminal threats.

While voluntary intoxication " 'is not a defense to a general intent crime,' " evidence of such intoxication "is admissible on the issue of whether or not a defendant actually formed a required specific intent or mental state." (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1312.)  The elements of the crime of criminal threats are: " '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person"; (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out"; (3) that the threat . . . was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat"; (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety"; and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' [Citation.]" (*In re George T*. (2004) 33 Cal.4th 620, 630.)  The offense is therefore a specific intent crime.

Since defendant did not request an instruction on voluntary intoxication, he cannot attack on appeal the trial court's failure to give one. (*People v. Myles* (2012) 53 Cal.4th 1181, 1217.)  Asserting he was entitled to an instruction on voluntary intoxication as a defense to the specific intent element of criminal threats, defendant claims counsel's failure to request such an instruction constituted ineffective assistance.

A defendant claiming ineffective assistance of counsel has the burden to show: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance

9

resulted in prejudice.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 [80 L.Ed.2d 674, 693-694, 697-698].)  That is, "there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.  [Citations.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 520.)

The defense of voluntary intoxication would be relevant only if defendant threatened Tara.  The defense was that Tara consented to sex with defendant and she sustained her injuries when he defended himself from her attempted armed robbery. Asserting that he made threats to kill or commit great bodily injury on Tara but was too intoxicated to understand the nature of those threats is inconsistent with the theory of the defense.  This provides a valid tactical reason not to seek instruction on voluntary intoxication.

There was also insufficient evidence of intoxication to support an instruction if it was requested.  There was no testimony that defendant drank or used drugs before the attacks.  The only evidence of defendant's possible intoxication was the testimony that he bought alcohol before bringing Tara and Jenny to his apartment, and Tara's speculation that defendant became angry at her because he was intoxicated.  A request for instruction on voluntary intoxication based on this evidence would fail.  "Counsel's failure to make a futile or unmeritorious motion or request is not ineffective assistance.  [Citation.]" (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836.)

III

*Sentencing Error*

The People ask us to correct three errors in the sentence.

The trial court sentenced defendant to 25 years to life for forcible rape with the serious bodily injury allegation, doubled to 50 years to life for the strike.  It imposed a consecutive term of 15 years to life for forcible oral copulation with serious bodily injury, doubled to 30 years to life for the strike.  It imposed a consecutive determinate term consisting of the terms for the other offenses, the offense-related enhancements for the

10

rape and forcible oral copulation convictions, and the prior prison term and serious felony enhancements, totaling 59 years.

The trial court also sustained one prior serious felony and two prior prison term allegations. In sentencing defendant, it imposed a single five-year term for the serious felony, stayed one of the two prior prison terms, and imposed a single one-year term for the prior prison term.

The People contend the trial court should have imposed additional serious felony and prior prison term enhancements on both of the indeterminate terms. We agree.

In *People v. Tassell* (1984) 36 Cal.3d 77 (*Tassell*), overruled on an unrelated point in *People v. Ewoldt* (1994) 7 Cal.4th 380, 401, the California Supreme Court "held that when imposing a determinate sentence on a recidivist offender convicted of multiple offenses, a trial court is to impose an enhancement for a prior conviction only once to increase the aggregate term, and not separately to increase the principal or subordinate term imposed for each new offense. [Citation.]" (*People v. Williams* (2004) 34 Cal.4th 397, 400 (*Williams*) italics and fn. omitted.)

In *Williams*, the California Supreme Court was faced with whether *Tassell's* holding applied to multiple indeterminate third strike sentences. (*Williams, supra*, 34 Cal.4th at p. 400.) The court reasoned that *Tassell* was "not controlling or even helpful . . . in this significantly different context" because *Tassell* relied on Penal Code section 1170.1[2], which "generally governs the calculation and imposition of a determinate sentence when a defendant has been convicted of more than one felony offense" and does not apply to multiple indeterminate sentences imposed under the three strikes law. (*Williams,* at pp. 402-403.) The court noted that "[t]he Three Strikes law, unlike section 1170.1, does not draw any distinction between status enhancements, based

---

[2]    Further undesignated statutory references are to the Penal Code.

11

on the defendant's record, and enhancements based on the circumstances of the current offenses, and the Three Strikes law generally discloses an intent to use the fact of recidivism to separately increase the sentence imposed for each new offense."[3] (*Williams*, at pp. 404-405.) The court therefore concluded "that, under the Three Strikes law, section 667(a) enhancements are to be applied individually to each count of a third strike sentence." (*Id.* at p. 405.)

The Fourth Appellate District concluded that "a similar analysis" to that employed in *Williams* applied to a second strike defendant who was not subjected to an indeterminate sentence under the three strikes law, but rather, subject to an indeterminate sentence because of his torture conviction. (*People v. Misa* (2006) 140 Cal.App.4th 837, 846-847.) The appellate court held that "[a]lthough [the defendant] was a second strike defendant rather than a third striker, he is nonetheless a recidivist and . . . is thus subject to a prior conviction enhancement under section 667, subdivision (a) on the torture count even though he also received a similar enhancement relating to the assault count." (*Id.*, at p. 847.)

*Williams* and *Misa* apply here. As in *Williams* and *Misa*, defendant received an indeterminate sentence, which is not governed by section 1170.1. Moreover, adding the prior serious felony conviction enhancement to each new qualifying offense in a second

---

[3] In *Tassell,* the court "explained how section 1170.1 affects the imposition of sentence enhancements: 'Section 1170.1 refers to two kinds of enhancements: (1) those which go to the nature of the offender; and (2) those which go to the nature of the offense. Enhancements for prior convictions--authorized by sections 667.5, 667.6, and 12022.1--are of the first sort. The second kind of enhancements--those which arise from the circumstances of the crime--are typified by sections 12022.5 and 12022.7: was a firearm used or was great bodily injury inflicted? Enhancements of the second kind enhance the several counts; those of the first kind, by contrast, have nothing to do with particular counts but, since they are related to the offender, are added only once as a step in arriving at the aggregate sentence.' [Citations.]" (*Williams*, *supra*, 34 Cal.4th at p. 402.)

strike sentence is "consistent with the logic of the Three Strikes law," which "uses a defendant's status as a recidivist to *separately* increase the punishment for *each* new felony conviction." (*Williams*, *supra*, 34 Cal.4th at p. 404.) Both the serious felony and prior prison term enhancements are those which go to the offense. While *Williams* and *Misa* addressed only the serious felony enhancement, their reasoning applies with equal force to prior prison term enhancements. (*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1561.)

"The failure to impose or strike an enhancement is a legally unauthorized sentence subject to correction for the first time on appeal."[4] (*People v. Bradley* (1998) 64 Cal.App.4th 386, 391.) While the trial court has the authority to strike the serious felony and prior prison term enhancements, it has already declined to do so when it applied them to defendant's determinate term, and expressly indicated its intent to impose the maximum possible term. Assuming without deciding that the trial court could strike the serious felony and prison term enhancements as to the indeterminate terms, we conclude the trial court would not have done so. We shall therefore modify the judgment to add both enhancements to both indeterminate counts.

The trial court stayed one of the prior prison term enhancements. The People correctly note that this is unauthorized; a trial court does not have the authority to stay the enhancement. (*People v. Eberhardt* (1986) 186 Cal.App.3d 1112, 1122-1123.) Since the trial court intended not to impose the enhancement, we shall modify the sentence to strike it.

The People finally note that the amended abstract shows the sentence for battery with serious bodily injury was imposed concurrently even though the trial court imposed

---

**4** Since the failure to impose or strike the enhancements on the two indeterminate terms results in an unauthorized sentence, defendant's contention that the People forfeited this claim by failing to raise it at sentencing is without merit.

it consecutively when pronouncing sentence.  We shall order that the new amended abstract reflect this sentence.

## DISPOSITION

The sentence is modified as follows:  the stayed prior prison term enhancement is stricken, and a prior prison term and a serious felony enhancement are imposed on the indeterminate terms for rape (count I) and for forcible oral copulation (count II).  As modified, defendant's sentence is 92 years to life plus 59 years.  In all other respects, the judgment is affirmed.  The trial court is directed to prepare an amended abstract reflecting the modified sentence and showing the term for assault with serious bodily injury in count V was imposed consecutively rather than concurrently.  The trial court is further directed to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

     ROBIE     , J.

We concur:

     HULL     , Acting P. J.

     HOCH     , J.

14